# CHARLESTON.

## LAYNE *v.* THE OHIO RIVER R'D CO.

### Submitted June 19, 1891.—Decided December 19, 1891.

1. JUSTICE OF THE PEACE—SUMMONS—MOTION.

    The proper method to take advantage of any defect in the summons or in the return thereto in a justice's court, is by a motion to quash, because in that court there are no formal pleadings, and hence the question can not be raised by plea in abatement, as it might and ought to be raised in the Circuit Court, where the suit is brought originally in that Court.

2. JUSTICE OF THE PEACE—SUMMONS—MOTION—APPEARANCE.

    In order to take advantage of such a defect in the summons or return, the defendant must appear for that purpose only and must so state in submitting the motion. If he appears, generally, whether to move a continuance or for any other purpose, he will be regarded as having waived all defects in the writ or the return.

3. JUSTICE OF THE PEACE—SUMMONS—MOTION—WAIVER—APPEARANCE.

    If in the justice's court the defendant appears and submits two motions simultaneously, one for a continuance, and one to quash the return on the writ, and at a subsequent day, to which the case has been continued, he appears and without requiring the justice to act upon his motion to quash, files an informal plea in bar, and proceeds to trial, he will be deemed to have waived his objection to the writ.

4. JUSTICE OF THE PEACE—SUMMONS—WAIVER—APPEAL.

    A defendant who has waived all objection to the summons and return in the justice's court by appearing there and submitting to a trial, can not on appeal to the Circuit Court, take advantage of any defect in the writ or return, either by motion to quash or by a plea in abatement.

5. DAMAGES.

    Where an action is brought to recover damages for the killing of stock upon a railroad track, the rights, liabilities and duties of the respective parties have been well defined and settled in this state in the causes of *Blaine* v. *Railroad Co.*, 9 W. Va. 252; *Baylor* v. *Railroad Co.*, 9 W. Va. 270; *Hawker* v. *Railroad Co.*, 15 W. Va. 628; *Washington* v. *Railroad Co.*, 17 W. Va. 190; and *Johnson* v. *Railroad Co.*, 25 W. Va. 570; and the principles laid down in those cases are approved and re-affirmed.

6. DAMAGES—RAILROAD COMPANIES—STOCK.

In the absence of special legislation on the subject requiring a railroad to fence its track, there is no general law which requires them to do so in this State; neither is there any general law against the owners of stock allowing animals to run at large or to depasture public roads: consequently the bare fact that a railway is unenclosed, or unprotected by cattle-stops where it crosses a public road does not in general render the railroad company liable to pay for such stock, straying upon the track and killed by a train; nor upon the other hand can contributory negligence be attributed to the plaintiff for allowing his stock to run at large.

7. DAMAGES—RAILROAD COMPANIES—STOCK.

The servants of the company in charge of its train are bound to use ordinary care to avoid injuring stock straying upon the track, and they are equally bound to adopt the ordinary precaution to *discover* danger as to avoid its consequences after it becomes known.

*V. B. Archer* for plaintiff in error.

*J. U. Myers* for defendant in error, cited 15 W. Va. 609; 16 Gratt. 410; Hutch. Land Tit. 66; 6 Kan. 385; 16 Neb. 328; 12 Am. & Eng. Ency. L. 440 and notes; 24 W. Va. 655; Code, c. 50, s. 32; 26 W. Va. 340; 32 W. Va. 183; 17 Gratt. 452; 3 Wood R'y Law 1549, 1555–1558; 74 Ind. 169; 55 Ind. 567; 13 Ind. 411; 26 Ind. 268; 40 Pa. St. 402; 59 Miss. 234; 23 Gratt. 619; 15 Gratt. 121; 4 Min. Inst. 746; 6 Leigh 135; 25 W. Va. 195; Id. 747; 5 W. Va. 115; 6 W. Va. 110; 7 W. Va. 715; 3 W. Va. 386; 8 W. Va. 259; Id. 581; 5 Gratt. 141; 6 Gratt. 197; Id. 287; 21 W. Va. 709; 16 W. Va. 308; 4 Min. Inst. 878; 32 W. Va. 440, 443; Hutch. Land Tit. 1029; 33 Gratt. 136; 12 W. Va. 184; 20 Gratt. 454; 23 W. Va. 217; Id. 549; 17 W. Va. 190; 25 W. Va. 576, 579; 9 W. Va. 253, 270; 71 Ill. 346.

LUCAS, PRESIDENT:

This was an action of trespass on the case brought by Layne against the Ohio River R. R. Co. before a justice of the peace. The plaintiff commenced his action by a full and particular statement in writing, the complaint being in effect a declaration wherein he claimed $175.00 damage for the running over and killing of a horse by defendant's cars in the county of Mason. The justice of the peace directed the summons to a constable in Wood county, who served the same and made return as follows:

"Received this writ on this 11th day of December, 1889, and I served the same on the within named defendant, The Ohio River Railroad Company, on the 11th day of December, 1889, by delivering to George W. Thompson, President of said defendant, personally in the county of Wood, and State of West Virginia, a true copy of said writ, in which county he, the said George W. Thompson resides. Given under my official hand this 11th day of December, 1889. W. H. DYE, Constable of Wood county, W. Va."

On the return day of the writ the justice took up the case and the record from his docket presents the following proceedings as entered by him and certified to the Circuit Court. The summons was as follows:

" State of West Virginia, Mason County, to wit: To W. H. Dye, Constable of Wood county: You are hereby commanded in the name of the State of West Virginia, to summon 'The Ohio River Railroad Company,' a corporation duly organized and existing by and under the laws of the State of West Virginia, to appear before me at my office, in the District of Waggener, in the said county of Mason, on the 23d day of December, 1889, at 10 o'clock A. M., to answer the complaint of Pleasant G. L. Layne in a civil action for the recovery of damages for the wrongful killing of plaintiff's mare, in which the plaintiff will claim judgment for one hundred and seventy five dollars. Given under my hand this 10th day of December, 1889. JOHN L. MASON, Justice."

The defendant sent the following motion by mail with the request to have the same entered upon the docket, which is in the words following, to wit:

"Pleasant G. Layne *vs.* The Ohio River Railroad Company. Civil action before J. L. Mason, J. P., of Mason county. This day the defendant by counsel moved the justice to quash the return of the constable's endorsement upon the summons in this cause." And also at the same time the defendant sent affidavit by mail asking for a continuance of this cause for one week from this date, which affidavit is filed with the papers in this cause; and thereupon on said application of defendant this cause is continued at the cost of said defendant from

the 23rd day of December, 1889, at ten o'clock A. M., to the 30th day of December, 1889, at ten o'clock A. M. On the 30th day of December, 1889, at ten o'clock A. M., the hour set for trial, the plaintiff appeared with his attorney, John U. Myers, and also the defendant appeared by their attorney, James H. Couch, Jr. All of the parties being ready trial was had, and upon the evidence produced by witnesses of the plaintiff, I, the said justice, find that there is sufficient cause that the plaintiff may recover damages from the defendant. It is therefore considered by me, the said justice, on the 30th day of December, 1889, that the plaintiff recover from the defendant the sum of ($150.00) one hundred and fifty dollars, his damages sustained, and the costs that have incurred in and about this suit. JOHN L. MASON, Justice."

From this judgment of the justice the defendant appealed to the Circuit Court, though he does not seem to have reserved any exception before the justice, nor ever to have insisted in the justice's court that his motion to quash should be acted upon, and in fact it never was acted upon. In the Circuit Court the defendant appeared by attorney and moved to quash the return upon the summons, upon the grounds that the person who signed the return was not authorized by law to execute it and make return thereof. He also moved to quash the summons itself, both of which motions the court overruled, and the defendant excepted and then entered a plea of not guilty.

A trial by jury was had, and a verdict rendered for the plaintiff for one hundred and fifty dollars. The defendant asked to have the verdict set aside and a new trial granted, which the court refused and entered judgments, and the defendant filed a bill of exception, setting forth all the evidence in the case, also the instructions offered by the defendant being six in number, all of which were granted and, so far as the record discloses, without objection on the part of the plaintiff.

The first assignment of error by the appellant is that the Court erred in overruling the defendant's motion to quash the return upon the summons, and the writ itself.

The proper method to take advantage of any defect in

the summons or in the return thereto in a magistrate's court is by a motion to quash, since in that court there are no formal pleadings, and hence the question can not be raised by plea in abatement as it might and ought to be raised in the Circuit Court where the suit is brought originally in that Court. The Code provides in section 15 of chapter 125 that "the defendant on whom the process summoning him to answer appears to have been served, shall not take advantage of any defect in the writ or return or any variance in the writ from the declaration unless the same be pleaded in abatement." In construing this section it was held by the Court of Appeals of Virginia in the case of *Barksdale* v. *Neal*, 16 Gratt. 314, that where the return showed that the summons was actually served on the defendant, although the judgment were by default, the Court would not disturb it, because the party had had opportunity to plead in abatement, and had neglected to do so. In that case, Judge MONCURE, who delivered the opinion, points out a distinction between an individual and a corporation, growing out of the language of section 7, chapter 170 of the Code of Virginia, from which is copied substantially section 38 of chapter 50 of our Code, as follows: "Service on any person under either of the last four sections shall be in the county in which he resides; and the return must show this and state on whom and when the service was, otherwise the service shall not be valid."

Whether this distinction drawn by Judge MONCURE be a valid one or not, in this case it is not necessary to decide, because the proceeding having originated before a justice no plea in abatement was necessary.

It appears by the record, or docket more properly speaking, of the justice's court, that the defendant enclosed to him by mail *simultaneously* two motions to be by him entertained and acted upon, without indicating which motion should be first taken up for consideration; one was a motion to continue the case, and the other a motion to quash the return on the summons. The ground upon which the latter motion was based was not stated, but if we are at liberty to inspect the summons we shall discover that it was issued by a justice of Mason county, but di-

rected by name to a constable of Wood county, and was served in the latter county upon the president of the Company who resided in the county of Wood. If the defendant had permitted the judgment to go by default, this defect no doubt would have been fatal to its validity, because in a judgment by default the writ becomes a part of the record, and may be inspected by the court, and if it be fatally defective, or there be no proper service in a case before a justice the judgment will be set aside. See *Hoke* v. *R. R. Co.*, decided at this term, *Todd & Smith* v. *Gates*, 20 W. Va. 604.

In the present case, however, the defendant appeared to the action and moved a continuance simultaneously with presenting his motion to quash. Not only so, but when the case was again called, the period of continuance having expired at the end of one week, the defendant again appeared to the action, put in his informal plea in bar, and proceeded to trial without having his motion to quash considered or acted upon, and this, so far as the record discloses, without any objection or exception on his part.

In the case of *Harvey* v. *Skipwith*, 16 Gratt. 410, it is said in the opinion of the Court; "objections which do not go to the substance of an action are treated as waived, if not made when the occasion of them arises. It is a well established rule that by appearing and pleading to the action, the defendant waives all defects in the process of the service thereof. The cases go further and imply such a waiver from the defendant's taking or consenting to a continuance as fully as they do from his pleading to the action. The object of the writ is to appraise the defendant of the nature of the proceeding against him. The fact of his taking or agreeing to a continuance is evidence of his having made himself a party to the record and of his having recognized the case as in court. It is too late for him afterwards to say that he has not been regularly brought into court."

This language is quoted approvingly by this Court in *Mahany* v. *Kephart, et als.* 15 W. Va. 619. In the latter case point 2 of the syllabus, page 609, is as follows: "By appearance to the action for any other purpose than to take

advantage of the defective execution or non-execution of process, a defendant places himself precisely in the situation in which he would be if process were executed upon him, and he thereby waives all objection to the defective execution or non-execution of process upon him." See, also, *Bank of the Valley* v. *Bank of Berkeley*, 3 W. Va. 386.

In the light of these decisions, it is manifest that the defendant waived his objections to the writ and the return thereon when he appeared in the justice's court for any other purpose than to press his motion to quash the return.

It is hardly necessary to present any arguments or authorities to show that the defendant, having appeared and submitted to trial in the justice's court, and having there, by the conduct of his defence, waived all objection to the writ, it was too late to raise the question on appeal to the Circuit Court; the very statement of the proposition in its demonstration. We must hold, therefore, that the first assignment of error is not well taken.

The next assignment is that the court below erred in not setting aside the verdict of the jury and granting a new trial.

The subject of the killing of stock by railway companies by collision on the line of their roads has been so often before this Court that if the law upon that subject is not now accurately defined and settled, we may well despair of being able to arrive at any conclusions which will serve as a guide to the bar, or the Circuit Courts, in the trial of such cases. Neither is this Court at liberty to consider the argument which counsel for the appellant presents relating to the prejudice of juries or the tax on railroad enterprises entailed upon the companies by assessing them with damages for the destruction of stock or other private property in the conduct of their business, or the running of their trains. There is much to be said upon both sides of the question, and it has been sometimes suggested that the prejudice of *juries* against corporations is primarily engendered by their apprehension of partiality on the part of the *courts*. Be this as it may, all such considerations should be addressed to the legislature and not to the judiciary, as the province of the latter is to interpret and administer the

law and not to make it. So far as this Court is concerned, it has been and will continue to be its purpose and aim to administer the law justly without favor, and freely without price; uninfluenced by any other arguments or considerations than those which are directed to eliciting the very right of the case, as indicated by the letter and spirit of the law, and the interpretation of binding and monumental precedents, established for our guidance by those distinguished predecessors who have earned for the judiciary of Virginia and West Virginia a well-deserved reputation.

One of the earliest cases upon this subject is the case of *Blaine* v. *The C. & O. R. R. Co.*, 9 W. Va., 252. This case was argued by Jas. H. Ferguson, assisted by Messrs. Fitzhugh and Laidley in behalf of the stock-owner, and by W. A. Quarrier and W. H. Hogeman for the company, and the opinion was delivered by that eminent jurist, Judge HAYMOND. The argument was elaborate and exhaustive, and the opinion a monument of learning and research. It would be entirely appropriate to quote the whole syllabus as applicable to this case, and settling its principles did space permit. Suffice it to say, that that case settles the principle that there is no law in this State (outside of special legislation enacted upon the subject) requiring a railroad to fence its track; neither is there any general law against the owners of stock allowing animals to run at large, or depasturing public roads. Consequently, the bare fact that a railway is unenclosed, whether by fence or by stops intended to answer the same purpose, does not, in general, render the railroad company liable to pay for animals straying upon the track and killed by a train; nor, upon the other hand, can contributory negligence be attributed to the plaintiff for allowing his stock to run at large. This is the view taken and urged by counsel for the appellant, and without quoting or further considering the vast number of authorities in other states and countries, we may regard this as the settled law of West Virginia.

The next case upon this subject was *Baylor* v. *B. & O. R. R. Co.*, Ib. 270, decided at the same term, the opinion being delivered by the same distinguished judge. The case affirmed the principle decided in the former case, and held,

further, that although a railroad company has the right to the free and unobstructed use of its track, and the paramount duty of its employees is the protection of the train and the passengers and property therein ; yet, consistently with these paramount duties, the servants of the company are bound to use ordinary care to avoid injuring stock upon the track, and they are bound, as well, to adopt the ordinary precautions to *discover* danger, as to avoid its consequences after it becomes known.

The next case upon this subject is *Coyle* v. *B. & O. R. R. Co.*, 11 W. Va. 94. That case was reversed upon an exception in the court below reserved by the appellant based upon the admission of the declaration of an agent of the defendant company. The general principles as theretofore ascertained and announced were re-affirmed.

The next case was *Hawker* v. *B. & O. R. R.*, 15 W. Va. 628. That case turned upon the peculiar phraseology of the declaration which charged that the injury to the stock was caused solely by the negligence and carelessness of the defendant in this, "that the said *defendant seeing the plaintiff's cattle on the track*, carelessly and wrongfully drove its locomotive on them *etc.*" It was held that under such a declaration the plaintiff could not recover if the evidence showed that the defendant's servants were guilty of no wrong or carelessness *after the cattle were seen* on the railroad, though they might have been guilty of such carelessness before they were seen.

Were the declaration in the present case of a similar character that case would control and would require a reversal of the judgment appealed from. But the language of the present declaration charges that the defendant "did not adopt and exercise ordinary care and precaution to discover said mare upon said railroad track in time to have avoided injuring her, and defendant also then and there so carelessly and negligently ran and managed its cars and locomotive that the same was ran against said mare and destroyed the same, *etc.*"

The next case was *Washington* v. *B. & O. R. R. Co.*, 17 W. Va. 190. The facts in that case as detailed in the opinion of the Court show that the train was going east

when two horses escaped from plaintiff's yard through a gate (negligently ?) left open, and came upon the railroad track just above a cattle-stop between the meadow and an adjoining field. The train ran at its usual speed according to the evidence of the plaintiff, no whistle blown, no attempt made to apply brakes. The railroad track where the accident occurred was perfectly straight for five hundred and fifty two yards and there was a full view of the track for six hundred and sixty yards above the place where the horses were killed; that the parties engaged in endeavoring to get the horses off the track did their best, but failed, but none of them made any effort to signal the train; that an alert engineer could have seen these endeavoring to get the horses off the track and that the train could have been stopped in a space of three hundred yards.

The defendant on the contrary proved by its employes that the engineer first saw the horses when the train was within thirty or forty yards of this cattle-stop; that the train was running thirty or forty miles an hour; that as soon as he saw the horses he blew the whistle and threw on the air brakes; that when the train got within twenty or thirty yards of a certain culvert the horses ran upon the track and tried to cross on the culvert when they were struck; that the train was stopped before it had entirely passed over the culvert. The engineer testified also that he was watching the track and when he first saw the horses they were eating in the fence corner; that the whistle was blown, air brakes applied and the train stopped within the shortest distance possible, which was eight hundred or one thousand feet with the brakes used and at the speed at which the train was running.

The jury found a verdict for the plaintiff, and the defendant moved to set it aside and grant him a new trial, but the Circuit Court refused, and on appeal to this Court that judgment was affirmed.

Judge GREEN, who delivered the opinion entered into an exhaustive examination of the whole question of negligence and especially of contributory negligence, and the case has ever since been considered a leading authority on that subject. The great similarity between the evidence

and general circumstances of that case and the present one, renders it peculiarly instructive. Space forbids my quoting more than one or two points of the syllabus. Point two is as follows: "Negligence is generally a mixed question of law and fact; but what particular facts or conduct constitute or amount to negligence is generally a question of fact for the determination of the jury from all the evidence rather than a question of law for the determination of the court, and the most the court can ordinarily do, when the question of care or negligence depends upon a variety of circumstances to define the degree of care and caution required by the law, and leave to the practical judgment of the jury the work of comparing the acts and conduct of the parties with the duties required of them under the circumstances. Yet there may be some cases where the question of negligence may be properly one of law for the court as where the case presents some prominent act, not depending upon surrounding circumstances for its qualities, and in regard to the effect and character of which, no room is left for ordinary minds to differ. But ordinarily the only efficient control the court can exercise over the jury in their determination of what is negligence, is in the power of the court to set aside their verdict where it is based on a false assumption.

8 and 9. The owner of horses in this State is not chargeable with an unlawful act or with negligence in allowing them to get upon a railroad track, if it be unenclosed. But he, by so doing, takes the risk of their loss or injury by unavoidable accident. But if killed by the negligence of the servants of the railroad company in running the train it is responsible. In such a case the servants of the railroad company are bound to use ordinary precaution to *discover* that the horses are on the track, as well as to avoid injuring them after they are seen.

5 and 6. By contributory negligence is meant such negligence on the part of the plaintiff as contributes to the injury that is directly in part causes it. It is therefore not contributory negligence for the plaintiff to be guilty of a negligent act which might have produced an injury if before it actually results, the defendant is guilty of some negligent

act which was the immediate cause of the injury, even though no damage could have resulted to the plaintiff, had he not been originally negligent."

The next case decided by this Court was *Johnson* v. *The R. R. Co.*, 25 W. Va. 570. The evidence in that case as detailed by the judge who delivered the opinion was as follows: "On the evening of May 13th, 1881, the plaintiff put his two horses in a pasture field some distance from the line of the defendant's railroad between Roseby's Rock and Moundsville; that between these points there is a straight piece of road nearly or quite a mile long; that a witness, Mrs. Berge, who lived near the defendant's road about the centre of this straight line, testified that she could see along the road a half mile on either side from her house; that about daylight on the morning of May 14th, 1881, she heard a locomotive whistle and went out of her house to look for a train; that she saw opposite her house the plaintiff's horses running on the track of the road and a freight train about four or five telegraph poles behind them running in the same direction at the rate of about twenty five or thirty miles an hour; that the horses continued running on the track in front of the train, until both train and horses passed out of her sight around a bend in the road a half mile from her house where she first saw them, and in that distance the train had gained on the horses so that it was but one or two telegraph poles behind them when it passed out of her sight; that she saw the engineer and trainmen sitting on the train doing nothing that she could discover; there was no check in the speed of the train nor was the bell rung or whistle blown until a short time after the train passed from her sight when she heard the whistle. A short time after the train passed the two horses were found on the side of the track, one of them dead and the other in a dying condition; both had their legs broken and were otherwise cut and bruised as if they had been struck and thrown from the track by a locomotive; they were found some distance around the bend where the train passed from the sight of the witness and some distance from each other; what these distances were can not be definitely fixed, as the witnesses differ in their

estimates, but the distance from the bend to where the farther horse was found would probably not exceed five or six hundred yards, and it was about half that distance to where the other horse was found."

Upon this statement of facts in delivering the opinion of the Court, SNYDER, J., remarks: "It does not appear from plaintiff's evidence that any one on the train even saw the horses. Not to have discovered the horses under the circumstances was of itself negligence on the part of the defendant's servants. If the engineer had discovered them promptly as he should and would have done had he exercised due care, he could by blowing his whistle and stopping his train perhaps have prevented a collision, and saved the horses. This was at least a probability for the consideration of the jury."

The next case is *Heard* v. *Railway Co.* reported in 26 W. Va. 455. The evidence in that case as detailed by Judge SNYDER, who delivered the opinion, was as follows:

"A little after daylight on a day of the last of August or first of September, 1882, as the passenger express train of the defendant was passing over its road going east at a speed of thirty miles an hour, the train struck and killed the plaintiff's mule, about one hundred and fifty yards above Paint Creek depot in Kanawha county. The road, in the direction from which the train approached the place where it killed the mule, was straight, and the mule could have been seen from the train five hundred or six hundred yards before it was struck. No signal was given, nor whistle sounded, and the train did not check up or stop either before or after striking the mule. One witness testified: "I saw the train kill the mule. I saw it just as the train struck it right at the spring. Train was between me and mule. Spring is about three feet from railroad track—on side of track that the spring is, there was a bank and fence. The bank was three feet high and slanting. When I saw it, it appeared to be trying to get away; it was trying to get up the bank. I did not see the mule on the track. It was by the side of the track just as the train caught it. It was the side of the train that struck it. Piece of step of passenger coach was torn off by the mule. Just as I

discovered the mule the train was right on it. That was the first I saw of the mule. I was on the river side of the track, but in front of place where the mule was struck. The mule was on hill-side of the track. I was about forty yards from where it was struck. Went right to it. It was killed immediately—it was broke all to pieces." Another witness testified that he was an employe of the defendant; that he did not know what train killed the mule; made a report of finding this mule to the division master of the defendant. He thought the fast train could be stopped in a distance of two hundred yards. "The spring referred to by other witness is six or seven feet from track on side next to hill on a level with the track. There is a fence up the hill about ten or fifteen feet off. The mule's neck was broken close up to his shoulder—his head was lying next to the bank, and the other part next to the track. There was six or seven feet between the rail nearest the bank and the bank."

Upon this evidence the jury having found a verdict for the plaintiff, the Circuit Court refused to disturb it, and on writ of error this Court affirmed that judgment. The principles theretofore established and announced in the preceding cases were again approved and re-affirmed to the effect that where there was no legal negligence and the question of negligence was purely one of facts or a mixed one of law and facts, it was for the jury to say whether the accident could have been avoided by the use of ordinary care and diligence on the part of the company's servants.

The latest case involving the killing of stock is *Bullington* v. *R. R. Co.*, 32 W. Va. 436, which is in entire accord with the previous cases.

In the case we are now considering the plaintiff was introduced as a witness in his own behalf, and being duly sworn, testified that he was the owner of a mare; that the same was a big bay mare, weighed about one thousand two hundred pounds, ten years old, a nice clean limbed animal; was a good match for another horse which he owned, and which he used as a team; that said mare was worth one hundred and fifty dollars; that he would not have taken less than one hundred and seventy five dollars for her; that

said mare was in his possession at the date of the accident; that on the day before the first day of September, 1889, he turned his horses—the mare aforesaid being one of them—out on the public road to get water at a pond, that is, it was a public road last July; that said mare went down the public road to the railroad; that there was no cattle-guards on lower and south side of the crossing, and that said mare went in upon the railroad company's right of way, where there was no cattle-guards; that she was killed in the county of Mason, and was killed one thousand five hundred and seventy six feet from the road crossing; that there was a fence on both sides of the said public road, and on both sides of the railroad, all the way down from the crossing to where the animal was killed; that there is a private crossing six hundred feet from the public crossing; that there is a curve in the railroad eight hundred feet from said private crossing; that his mare was killed one hundred and seventy six feet from the beginning of said curve; that the horse was killed on the side of the railroad next the hill; that the cut commences near the private crossing; the cut extends from the place where the horse was killed over nine hundred feet; that said cut was four feet and eight inches deep at the point where the horse was killed; that the bank of the cut is within three feet of the railroad track; at about a hundred feet up the railroad from the point where the horse was killed the cut is about the same depth; that said cut is five feet and one inch deep at the deepest place, this point being a hundred yards up or north of where the horse was killed. That a hundred yards still further up the railroad, the said cut is three feet deep, and then slopes off to grade; that said horse was killed, and was lying three feet from the bank; that there was a rail fence on the side of railway's right of way where said horse was killed; board fence north, or above that; that fences are within fifteen to twenty feet of the cut; that where said curve commences the fence is twenty feet from the railroad; that the *curve* begins on the line of the Siegrist and *Rouch* lands. That said mare was killed early on the morning of September 1st, 1889. That he lives in one half mile of the railroad; that at the time the

horse was killed it was sun-up; that he could see and did see the train which killed the horse; and that he did not see that train slacken its speed; that he could not see the horse; that he heard the train give two whistles; that he lives up a mile from the crossing; that *straight* from where he lives it is from one quarter to one half a mile to the railroad; that he heard two whistles; did not see steam shut off; that he went down to where the horse was killed; that she was struck on the rump and her brains were knocked out; that it was three feet from the rail of the railroad to where the horse was killed; that the bank was steep; that there is a ditch along the side of the railroad; that he tracked the horse; that he saw the tracks from the private crossing; that he could tell by the tracks that the horse was running; that he did not look for tracks above the private crossing, but the tracks below that were long jumps; that these long jumps continued six hundred feet from where they commenced, and the short jumps, like where the horse was trotting along, began three hundred feet from the private crossing; that there was no evidence that the animal came down the bank; that he examined the bank and could see no tracks showing that the horse came down the bank, she ran down in the ditch where she was killed; that he saw where they knocked her against the bank. That it was a bright, clear morning.

And upon cross-examination the witness stated the following facts:

That the road mentioned was made a county road on the 2nd day of July, 1889; and that there had been a road there used by the public for over thirty years, that the railroad was built along there where this road crosses the railroad before said road was made a county road; that he did not see his horse on the track; that he turned the horse out on the public road; out on the turnpike, the evening before his horse was killed; that he heard a locomotive whistle; that the point where the horse was killed, was one thousand five hundred and seventy six feet from the crossing, and nine hundred and seventy six feet from the private crossing; that there was no public or private crossing at the place where the horse was killed; that the railroad had

been constructed two years before the road was made a county road at the crossing to which his horse went upon the railroad company's right of way.

And upon re-direct examination said witness testified to the following facts:

That the railroad track is *straight* from the curve north, for two miles; that there is no physical obstruction from the curve north, for a distance of about two miles; that he put a man at the point where the curve commences, and he could see a mile up the railroad; that the horse was killed by a freight train going south early in the morning, about sun-up; that he could not see very far up the railroad from where the mare laid—where she was killed; that he didn't try to see how far he could see from the point where the mare laid; that the railroad train which killed his horse was going south; that there was a cattle-guard at the line between the Seigrist farm and the farm lying above the Seigrist farm; on the Roush side of the crossing, that the said train was a train belonging to the Ohio River Railroad Company.

Andrew Weaver, introduced and sworn on behalf of the plaintiff, testified to the following facts:

That he lived at New Haven; that he remembered the morning of the killing of the plaintiff's horse; that it was on Sunday morning; that there was a quarterly meeting near New Haven, and he got up early to go to it; that on his way up to the quarterly meeting he learned of the killing of the plaintiff's horse; that he went upon the railroad; that just above Mr. Jones's house he saw the plaintiff's horse lying with her head turned towards the railroad; that *the* horse was lying about half way in the curve, about one hundred and fifty yards from Mr. Jones's house; that there was a gash on her hip, and her brains were knocked out; that he noticed the leaps where the horse ran along the side of the railroad; that he counted twenty rails where the horse had leaped along the railroad track; that said rails were thirty feet long, they were iron rails, that he saw the horses tracks where she had started from a little below the private crossing; that it was about two hundred and seventy six feet from where the horse started to run to the private

crossing; that the tracks above that were from two to three feet apart up to the private crossing; that he followed the leaps down from where they commenced to where the horse was lying; that the other horses had crossed the railroad track to the right; that he noticed to see where the horse had made any attempt to get up the bank, and that she never made any attempt to get up, only where the impression was in the bank, was where the horse was knocked into the bank; that he saw the imprint of her hoofs near the track; that the bank is from five to six feet from the iron rails of the railroad; that Mr. Lane, Mr. Eady Lane's boy, and himself noticed to see how far up the track an object could be seen; that Mr. Lane's boy stood one mile above the private crossing and he could see the boy from where the horse started to run; that they placed a man where the horse was killed, and the man's head and shoulder could be seen from a distance eight hundred feet north of where the man stood; that the horse ran straight down in the ditch from where he started to run to the point where he was killed; that from where the horse was killed to where the railroad track got straight it was one hundred and seventy six feet, and from that point, that is: where the railroad track got *straight,* a person could see one mile up the track; that the morning the horse was killed was a nice morning; bright morning; that he noticed the train on the morning; that the train was a little behind time; that he lives by the side of the place near where the horse was killed; that the cash value of said horse was one hundred and fifty dollars; that she was worth more than that.

And upon cross-examination the witness testified to the following facts:

That said train passed New Haven between daylight and sun-up; that the curve where the horse was killed is about three hundred feet long, and the cut there about one thousand three hundred feet long; from the public crossing to the private crossing is about six hundred feet, and from the private crossing to the curve about eight hundred feet, and from the curve to where the horse got killed, one hundred and seventy six feet; that above the curve there is from one half to one mile of straight track.

The testimony for the defence was given by the engineer and fireman. The engineer stated that on the morning of the accident a horse ran across the track—he noticed that one—and a few seconds afterward the fireman hollowed and said: "Look out there Ed!" He looked and noticed another horse come down to the side of the track and stop. He shut off engine, called for brakes and by that time was up to the animal, being on a very short curve he could not see a very great distance. The curve was to the left. It was 3:50 in the morning and was very foggy at the time. Was going south on schedule time with twenty five cars of steel rail. Was on right hand side of the cab, looking ahead on the track. His fireman was sitting on left hand side. Was not over twenty five yards from the animal killed, when he first discovered it; was one hundred dred and fifty yards from the animal not injured; could not have discovered the animal killed sooner than he did; could not have seen it until it got right down to the track where he first saw it; could not see it, because it was foggy and on a curve, and the animal was off to the left grazing; the animal never got on the track; it was on the side of the track, about four of five feet probably when I first discovered it; there is a small cut at this place and the horse must have been probably half way in the little cut; the curve was in that cut, and the banks of the cut three or three and a half feet; as soon as he saw the horse he shut off engine, called for brakes and did everything he could to prevent injuring the horse; could not have discovered the horse sooner than he did, because it did not sooner get in view.

On cross-examination, this witness stated that he sounded the alarm as soon as he saw the animal. When he sounded the alarm the horse just stood there—never moved. It never moved from the time he saw it come to the side of the track until he had passed it. Did not have air brakes or anything of the kind—we do not use them on freight engines of this kind. Train was supplied with a brakeman who got out when he saw the animal. Engine was supplied with all modern improvements, was in first-class repair. Had a very heavy freight train of steel running be-

tween eighteen and twenty miles an hour with a wet rail
—could have stopped the train in half a mile probably.

The evidence of the fireman was substantially to the
same effect; both of them testifying that after they had dis-
covered the animal in dangerous proximity to the track
they took every precaution to avoid injuring it, and that
they could not have discovered it sooner than they did; that
the morning was foggy, and obscured the view.

It will be perceived that much of this evidence is in di-
rect conflict with that of the plaintiff and must be rejected.
The witnesses for the plaintiff testified that the sun was up,
and that it was a bright, clear morning; and that the horse
instead of standing motionless, as testified to at one time by
the engineer, jumped as if in a full run from the private
crossing to the point at which it was killed, a distance of
nine hundred and seventy six feet, and that from the pri-
vate crossing northward one mile, the track was straight,
and a boy standing at the same could be seen for that dis-
tance. The question presented is precisely that presented
in the Washington case, and the other cases which I have
cited, viz: whether the animal was discovered by the engi-
neer and fireman as soon as it ought to have been had they
been in the exercise of due vigilance, and whether after
the discovery, they used due diligence to avoid collision.
These were questions of fact to be determined by the jury
and in the light of our decisions in parallel and almost pre-
cisely similar cases, we must hold that the Circuit Court
did not err in refusing to interfere with the verdict of the
jury, and its judgment must be affirmed.

AFFIRMED.