# CHARLESTON.

PARKER *v.* THE NATIONAL MUTUAL BUILDING & LOAN ASS'N.

Submitted February 11, 1904.    Decided February 23, 1904.

1.  INSTRUCTIONS—*New Trial.*
    An instruction embodying an abstract proposition of law, without in any way connecting it with the evidence or indicating what facts the jury must find from the evidence, in order to make it applicable to the case, ought not to be given; and, if the court can see that such an instruction has confused or misled the jury, the judgment resulting from the verdict will be reversed.  (p. 144).

2.  INSTRUCTION—*Evidence.*
    An instruction, though correct in law, should be refused unless there is a basis for it in the evidence, and it is the province of the court to determine whether there is a foundation in the evidence for any particular instruction.  (p. 145).

3.  INSTRUCTION—*Error.*
    Where the plaintiff, in an action at law, fails to introduce any evidence at all to prove a fact essential to his recovery, it is error for the court to give an instruction which submits to the jury the question of the existence of such fact.  (p. 145).

4. CONTRACT—*Agent.*

    Under a special contract between an owner of real estate and an agent for the sale thereof, on commission, at a price agreed upon, the agent cannot recover his commission without proving that he has actually made a sale at the price stipulated, unless it appear that his principal has wrongfully prevented the making of a sale at such price which would have been made but for his interference, or has waived the strict performance of the contract. (p. 146).

Error to Circuit Court, Summers County.

Action by C. L. Parker against the National Mutual Building & Loan Association. Judgment for plaintiff. Defendant brings error.

                                         *Reversed.*

R. F. DUNLAP, for plaintiff in error.

MILLER & READ, for defendant in error.

POFFENBARGER, PRESIDENT:

    The National Mutual Building and Loan Association of New York complains of a judgment of the circuit court of Summers County in a civil action instituted against it by C. L. Parker before a justice of the peace, from whose judgment an appeal was taken.

    The first question presented is whether the court erred in refusing to dismiss the action because of defective process in the justice's court. The defendant being a non-resident having property in the county in the form of money due to it, accruing from rents on property and other sources, an attachment was sued out at the commencement of the action and served on a number of persons as garnishees. The original summons was returned unexecuted which made it necessary to issue and have posted, a second summons, returnable in not less than one nor more than two months after its date as provided in section 202 of chapter 50 of the Code. The transcript of the justice's docket and, said second summons shows that it was made returnable on the 21st day of July, 1901, but an affidavit found in the record states that it was in fact returnable on the 20th day of July, and that afterwards on the 29th day of July, the justice altered the return day of the summons and date there-

of in his transcript so as to read July 21st, instead of July 20th. On said 20th day of July, the defendant appeared by its attorney and was granted a continuance until the 27th day of July, when another continuance was had by agreement of counsel until July 29th, on which day the parties again appeared and the transcript says the defendant appeared specially for the purpose of moving the court to quash the summons and also the attachment and affidavit, which motion was overruled and a trial was had, resulting in a judgment in favor of the plaintiff for $132.50. The ground of the objection to said summons is that the day on which it appears now to have been made returnable, July 21, 1901, was Sunday. The ground of the first motion in the circuit court to dismiss was that said second summons was void because returnable on Sunday, and that the justice had no jurisdiction to grant a continuance allowed on the 20th day of July, 1901. After it was overruled, the defendant was permitted to file said affidavit, showing that its attorneys had not discovered that the second summons was intended to have been made returnable July 21st, instead of July 20th, until after the trial commenced and all the evidence had been introduced and the case heard, and that then it offered to prove that the return day was Sunday, July 21st, instead of July 20th, and moved to dismiss the action, and that then the justice, after overruling the motion to dismiss, altered the return day of the summons as stated. Having done this, the defendant renewed its motion to dismiss the action and the proceedings had therein upon the same grounds as before, and this motion was overruled. An exception was taken to the action of the court in overruling these motions.

The obvious purpose of filing the affidavit was to weaken the effect of the general appearance made by the defendant on the 20th and 27th days of July, which is generally held to operate a waiver of irregularities in the process and invalidity of the return of service. *Thorn* v. *Thorn,* 47 W. Va. 4; *Lane* v. *Railroad Co.,* 35 W. Va. 438. The latter case holds that an appeal from the judgment of a justice of the peace gives the circuit court jurisdiction of the person of the appellant and works a waiver of all irregularities in the proceedings before the justice. Unless the defect in the process amounts to more

than an irregularity, the court was clearly right in overruling the motion. An action may be commenced before a justice of the peace without any summons, if the parties appear and agree to try the matters in difference between them. This is a liberality in practice which does not obtain in other courts, and, upon it, might be founded an argument that a justice may acquire jurisdiction upon a void summons if it serves the purpose of bringing the defendant in. That, however, would not be a voluntary appearance and submission of the case by agreement. But this question need not be decided, for the summons commencing the action, the first summons, was good. The second summons, though insufficient and void, was only a step in the action after commencement and, therefore, an irregularity in the proceeding. By appearing to the action generally, therefore, the defendant, under the decisions referred to, waived the defect.

Nor, if the motions can be said to have gone so far as to ask that the attachment be quashed, did the court err in overruling them. They were to dismiss, on the grounds stated, the action and all proceedings had therein. This second summons corresponds in the justice's court to an order of publication in the circuit court. It is posted to give notice of the pendency of the action and seizure of the property. It is process against the person of the defendant, though necessary to the regularity of the attachment proceeding. The object of the notice is to enable the defendant to appear and plead, as well to the affidavit of attachment, as to the merits of the claim or demand. Wade on Notice, s. 1144. It is process to bring in the defendant, but is not in every sense original process, for jurisdiction of the *res* is acquired on the first summons with the attachment. Failure to issue or post the second is a means by which it may be lost, but it is an irregularity, as clearly cured by a general appearance as want of service, or a defective return. It is not a substitute for the first summons and affidavit, giving jurisdiction, but a subsequent step made necessary by want of service of the first summons, and stands in lieu of service as to the property seized. Appearance to the action, therefore, is an appearance for the purpose of the attachment, and it is so held by the courts. *Andrews* v. *Mundy,* 36 W. Va. 22. Had there been a special appearance in the first instance,

the case would have presented a different aspect, and would be governed by a different rule. Whether, under the principle announced in *Brown* v. *Gorsuch,* 50 W. Va. 514, the second summons might have been re-issued, it is unnecessary to determine. This must not be taken to mean that, by such general appearance, the defendant waives all defects in the attachment. He is in the same situation as if service of the summons had been made upon him, not better and no worse.

Exceptions were also taken to the action of the court in admitting certain evidence and giving certain instructions over the objection of the defendant. To ascertain whether there is any error in these rulings, it becomes necessary to show the nature of the demand and the amount and character of the evidence.

The claim is for commission on the purchase money of a house and lot in the town of Hinton, known in this case as the Peck property, sold by the defendant to E. C. Lowe, for the sum of $2,650.00. Parker claims to have acted as the agent of the defendant in effecting said sale upon the agreement of the defendant to pay him a commission of 5 per cent. The evidence offered by him in support of his claim is in substance as follows: He testified that, at the time of the sale, he was, and had been, for six or seven years, an agent of the association, having authority to collect dues, interest, premiums and rents, and make repairs upon, and sell, property purchased by the defendant at foreclosure sales, receiving as compensation, 2 per cent. for his collection of dues, interest and premiums, and 5 per cent. on expenditures, repairs, collection of rents and sales. He had sold three pieces of property and received a commission of 5 per cent. on the purchase money. In addition to certain letters from Sutherland and Gibson, successive secretaries of the building association, purporting to confer upon him authority to sell certain pieces of real estate, including the Peck property, on a commission of 5 per cent, which were admitted in evidence, he testified to a verbal contract between him and Gibson in which Gibson said, in response to an inquiry from the witness as to how he was to be paid for looking after the property of the association, "It is our rule that our agents get 5 per cent. on repairs and 5 per cent. in case of sale, and you will be well paid as you will get 5 per cent. on expenditures

for repairs and 5 per cent. on sale of the property when sold." Lowe had come to the witness and asked him if he had the property in charge, and, upon being informed that he did, submitted a proposition to purchase at $2,200.00 or $2,250.00, which the witness had sent to the association without disclosing the name of the person proposing to buy, and which was rejected. Later, he submitted the proposition of James H. Miller to purchase at $2,500.00 which was also rejected. Being asked on cross-examination whether the association had not given him only leave to submit propositions, he said: "They always, when speaking of the sale of the property, would come at me with that 'cock and bull story' about so much net to the Association and so much commissions in case I made the sale at a stated price."

Some of the letters introduced are evidently intended to show the general employment of the plaintiff by the association as agent to collect dues, interest, premiums and rents, and look after the property and make repairs as ordered. Portions of others of them relate to sales of property. One bearing date March 18, 1898, contains the following: "In case we can arrange it would you like to have these properties under your control for rental and sale? If so, what commission would you charge for looking after properties against trespasses, duly protect it, rental and collection? Also your commission in case of sale. Upon full information concerning the above we will further advise." Another dated May 18, 1898, evidently referring to a piece of property other than the Peck property, says: "We hope you will make such efforts for a sale of this and other properties as to which we have written you today. How soon do you think we ought to be able to sell this property and at about what price?" Another, dated November 22, 1898, says: "You wrote us a short time ago that you thought you had a customer for the Peck property. What progress are you making and is there any prospect of the sale of this and other properties during the present winter. We will entertain any reasonable offer made for the Hughes and Gores properties, and you can submit such offers as you may receive, or for the Peck property, but you might just as well inform any prospective purchaser of the latter property that we will not sacrifice it." Another dated October 23, 1899, contains this: "We also note

that you are trying to dispose of the Peck property; that you think you have a man that will make a proposition sometime during the present week and will submit his proposition as soon as he makes it.   Try and collect the rent before the property is sold, for we will have a poor chance of doing so after it is sold.   You must remember that we have paid out through you a very large amount of money to put this property in good condition, and you also know that we ought to have the rents to pay at least on the amounts disbursed.   We hope you will push for it without delay."   One bearing date May 7, 1900, says: "We are very anxious indeed to dispose of the Peck property and are at a loss to understand why this fine property does not sell when it is so admirably located on your court house square."   One dated June 8, 1900, says:  "We are in no hurry to dispose of the Peck property and we are determined to get our price before we let it go.   We enclose an addressed stamped envelope and will thank you to give this letter prompt attention."   Another dated September 18, 1900, says:  "We remember the location of the property very well, and it seems very singular to us that you are unable to get a customer for it that would let us out whole.   You have our figures and they certainly are not unreasonable and if any of the real estate speculators in Hinton think we are going to sacrifice this property, they are very much mistaken.   We wish you would make an effort to find a customer."   One dated November 13, 1900, says:  "In view of the prosperous condition in West Virginia, don't you think the time has come when this property ought to be sold.   We have laid out upon it since it came into our possession $635 in repairs, a very large sum of money, and we are willing to sell the property as you know for $4,000.00 cash and allow a commission of 5 per cent. for the sale and if we are getting the full rentals out of this property it would amount to considerable more than 10 per cent. gross on the price we ask for it.   * * *   And we have laid out for permanent improvements $634.00, bringing the total cost of the property to almost $4,000.00.   It is unnecessary for the writer to remind you that this property is first-class in all respects and we are astonished at the prospects of a 5 per cent. commission that you cannot interest some capitalist in its purchase.   We would prefer, of course, to get all cash for the property, but we would be willing

to sell it on the same basis, $2,000.00 cash, and the balance in two annual payments of $1,000.00, with interest at 6 per cent, the purchaser to assume the State taxes for 1900, we having already paid the city taxes. Please take this matter up and endeavor to do something with it and report, and oblige." The last, dated, December 28, 1902, says: "In view of the prosperous condition of the State of West Virginia, the great demand for coal and the good prices being paid therefor, isn't it possible for you to interest some capitalist in Hinton in the Peck property? Certainly there is no better property in your town than that facing the Court House square. The very fact of the new court house being erected, the ground laid out and walled in should of itself very largely enhance the value of all the lots along that street, and it does seem as if the Peck property should fall into the hands of some man of means, if not for immediate improvement to be held as an investment. Hinton is so peculiarly situated geographically that you have only a few streets, the future value of the land on which is assured and we certainly think that the Peck property is most desirably located in that respect. There is a good commission in the sale for you and it would pay you to give the matter some attention. We are much obliged to you for your letter."

The evidence for the defendant consists of the deposition of William Gibson, its secretary, together with certain letters filed with it as exhibits; and the evidence of E. C. Lowe, the purchaser of the property. Gibson says Parker had charge of the Peck property for the purpose of collecting rents and making disbursements for the repairs under instructions from the association, and "general authority that if he should make a sale, at figures which were approved by the association that he would receive a commission for his services." He denies that Parker ever induced or recommended Lowe as a purchaser, and that he, as secretary of the association, had any knowledge that there had been any negotiations between Parker and Lowe. Some of the letters filed with Gibson's deposition relate to the property in question but form no part of the correspondence between Parker and the association. Gibson had other parties attempting to sell the property. He files a copy of a letter from Parker dated April 17, 1898, in which he says he is willing to take charge of the Peck property and do the best he can for 5 per

cent. on collection and sales, should there be any. Another is dated February 8, 1901, in which he says he has a proposition of $2,000.00 cash for the property, but does not advise its acceptance. Then follows a copy of a letter from Gibson to Parker dated February 18, 1901, which, after referring to the Miller offer of $2,500.00, the appraised value of the property and the amount loaned on it, says: "We will sell the property for $3,000.00 spot cash net to the association, you to add your commission to that figure, the amount, $3,000.00, to be remitted to this office by draft on New York and on receipt of such sum we will forward a deed for the property.. Or we will sell for $3,500.00, $2,000.00 of which is to be cash and the balance $1,500.00 payable in one year from date of sale, with interest at 6 per cent. and will pay you from this price your commission of 5 per cent. for selling, will give the deed and take a trust deed to secure the balance of the purchase price. The buyer under either proposition to pay the taxes for 1901." On February 26, 1901, Gibson wrote again declining the $2,500.00 cash proposition and repeating the price and terms given in the letter of February 18th. Lowe testifies that Parker did not induce him to buy the property. On the contrary, he went to Parker and made an offer of $2,000 which Parker promised to submit to the association, and, after waiting five or six weeks for a reply and calling upon Parker several times for it, without avail, he submitted his proposition direct to the association and began negotiations for the property which resulted in its purchase.

The defendant objected to the introduction of the letters filed by Parker on the grounds that they are irrelevant. This position is untenable for the reason that some of the letters bear directly on the question of the employment of the plaintiff to sell the property and the others show his general employment by the association, under which he had duties to perform respecting the very property sold. It is not improper to show their relation to one another and to the subject matter of the contract. Some of the letters bear more directly upon the issue than the others, but none of them can be said to be wholly irrelevant.

On the other side, it is urged that the letters filed with Gibson's deposition are inadmissible because they are not identified

nor expressly made parts of the deposition. And the deposition itself is said not to be in the record because not identified and made part of the bill of exceptions. This objection falls also, for the deposition is described in the bill of exceptions by its date, the notary before whom taken, the place where taken and the name of the witness. Turning to the deposition printed in another portion of the record, it is found to correspond with the description as fully as if it had been referred to as the deposition marked "B" or in any other manner. The letters annexed to it were called for by the plaintiff on cross-examination of the witness. In response to his demand, Gibson promised to produce and file with his deposition all the correspondence relating to the sale of the property, and the notary attached the letters to the deposition by brass fasteners and wrote on a sheet of paper attached to them "Exhibits produced by the witness William Gibson," and then signed his name to the inscription. All these letters, when examined, proved to be just such letters as were called for. It is unnecessary, however, to say whether they are sufficiently identified, for no objection to their introduction was made at the trial. There is an objection to them endorsed on the back of the deposition under date of July 26, 1901, but the record nowhere shows that the introduction of any of them was objected to at the trial. If a party can object to the use of a paper brought into a deposition at his own instance, and in the form determined by himself, he has not done it in this instance, for his failure to object at the trial is a waiver. A bill of exceptions says the exhibits filed with the deposition were introduced on behalf of the defendant. Whether sufficiently identified or not, they were introduced along with the deposition, in the presence of the plaintiff and his attorneys, without objection, so far as the record shows, and under principles too well known to require citation of authority for it, the objection interposed now comes too late.

Bill of exceptions No. 4 contains all the instructions in the record. The argument and references in the bill of exceptions seem to proceed upon the theory of two instructions. Whether given as one or as two is unimportant. The matter is set out in the bill of exceptions as follows: "The court instructs the jury that where an agent is employed to sell real estate for his principal if the agent was the procuring cause of the sale of said

real estate the agent is entitled to his commissions, without regard to the extent of his exertions, and although the contract commenced by said agent was consummated by the principal himself or through the intervention of another; and the court further instructs the jury that where a broker or agent employed to negotiate a sale procures a customer for the sale of the said property on the terms proposed by the owner and the principal takes the further proceedings out of the hands of the broker, and completes the sale himself, the agent is nevertheless entitled to his commissions, and the principal cannot deprive him of his rights to compensation by a discharge before the sale is consummated, and this is true where the principal completes the contract with the customer presented by the broker on different terms from those stipulated to the broker."

The legal propositions stated by these instructions are no doubt correct, but they are purely abstract. They make no reference whatever to the evidence, nor do they submit to the jury the finding from the evidence of the facts giving rise to the law enunciated in them. One of them says: "Where a broker or agent employed to negotiate a sale procures a customer for the sale of said property on the terms proposed by the owner, and the principal takes the further proceedings out of the hands of the broker," etc., the broker is entitled to his commission. Had the court given this instruction in the concrete instead of the abstract form, it would have said: "If the jury believe from the evidence that the defendant employed the plaintiff to sell the property mentioned in the evidence at a certain price, and agreed to pay him, in case he made such sale, a commission, and, in pursuance thereof, the plaintiff procured a customer for the sale of the property on the terms fixed by the defendant, and the defendant prevented him from making the sale by interfering and consummating the sale himself with the customer, they should find for the plaintiff." This would have directed the minds of the jury to the facts necessary to be ascertained by them in order to reach a proper conclusion. An instruction for the defendant embodying the same proposition of law might have been given, and in it the jury would have been told, in substance, that if the plaintiff, acting under such contract of employment, failed to procure such a purchaser, they should find for the defendant. Instructions should apply the law to

the facts in the case. "It is not the proper course for the judge to lay down the general principles of law applicable to a case, and leave the jury to apply them; but it is his duty to inform them what the law is as applicable to the facts of the case. An instruction, however pertinent and applicable it may be, is abstract unless it be made to apply, in express terms, either to the attitude of the parties or to the very facts in issue." Blashfield on Instr. s. 92. "It is not the province of the judge to impress any particular view of the facts upon the jury, but it is his province to make his charge so directly applicable to the facts as to enable the jury to render a correct verdict. To leave as little room as possible for them to make mistakes in applying the law to the facts, which they may be very liable to do when they have only general abstract propositions given to them in charge, there ought, if possible, to be no room for misunderstanding the charge or its application, and to this end it ought to be specific and direct." *East Tennessee V. & G. R. Co.* v. *Toppins,* 10 Lea. (Tenn.) 64. "Courts should apply the principles to the facts in evidence, stating the facts hypothetically." Blashfield on Instr. s. 92.

Whether the legal proposition should have been in both forms, or only one of them, depends upon whether or not, looking at the evidence introduced, the court could say there was room or ground for either of the two conclusions presented, dependent upon an issue of fact to be determined by the jury. If there is no evidence whatever upon which one of the conclusions may stand, there is no reason for giving an instruction embodying the hypothesis upon which it is based, nor can the court do so except at the risk of confusing and misleading the jury. The statement of the principle without any application of it to the facts or direction to the jury as to what facts they should look for in the evidence, is even more likely to mislead for the reason that, in the effort to apply it, they are called upon by the court to wrestle with both the law and the facts and form for themselves the hypothesis upon which the conclusion depends, and it leaves room for the jury to form two, where there may be no evidence whatever to support one of them. That is exactly what has occurred here. No evidence of the performance of the contract proved was before the jury. The instructions raised and presented to the jury a question which had no root or founda-

tion in the evidence. Hence, it could perform no function except to mislead the jury.

The evidence plainly shows that the plaintiff's contract for commission on the sale of the property was upon condition that he should sell it, or procure a purchaser for it, at a price in excess of $3,000.00. He admits in his own testimony that he was always confronted with the proposition of a certain amount net to the association or for a commission to be paid to him upon a sale at a stated price. He utterly fails to introduce any evidence tending to show any promise on the part of the association to pay him a commission under any other circumstances, and also to show any agreement to pay a commission upon the sale of the property at a price less than, or even so small as, $3,000.00 It appears that the association finally concluded to sell, and did sell, the property for a less sum, but there is not a word of evidence to the effect that it ever promised to pay a commission upon a sale for a smaller amount. It may have been a hard contract and the plaintiff may have entered into it under a misapprehension of the law, but that cannot relieve him from the terms of his contract. In order to recover, he is bound to show compliance with it. This, he has utterly failed to do, so far as the evidence shows, for he does not pretend to show that he procured a purchaser for the property, or made a sale of it, or could have made a sale of it, at a price, which, under his contract, would have entitled him to commiission. Hence, the evidence in the case was such as to afford no room for two conclusions. There is but one side to the case and, upon that side alone, an instruction should have been given; for there is but one conclusion at which a jury could arrive without wholly disregarding the evidence. "An instruction, though correct in law, should be refused unless there is a basis for it in the facts of the case, and the evidence or the pleadings make the instruction pertinent; and it is the province of the court to determine whether there is a foundation in the evidence for any particular instruction." Blashfield on Instr. s. 83. In this state of the case, the character of the instructions left it open to the jury to find either way. While not bound to give any instruction unless requested, it was the duty of the court not to give an instruction of such character as would tend to confuse and mis-

lead the jury. Assuming that the jury understood these instructions to have been given for the plaintiff, it is clear that they were bound to do one of two things, namely, render a proper verdict for the defendant contrary to the instructions, or an improper verdict for the plaintiff in conformity with their view of what the instructions meant. They adopted the latter course and rendered a verdict wholly inconsistent with the evidence. Upon the evidence, no instruction could properly stand except one expressly or substantially directing a verdict for the defendant, for there was no evidence to sustain any other finding.

It is no doubt competent for an owner of property and an agent, for the sale thereof, to make a contract whereby the agent shall have his commission upon the sale regardless of the price. Where there is a mere employment of a broker to make sale upon commission without any limitation as to price, he would likely be entitled to his commission upon any sale made to a purchaser procured by him. But to sustain a recovery of the commission under such circumstances, there must be some evidence tending to show that such a contract was made. Where a special contract for commission, dependent upon a sale at a given price, is made, the agent or broker is bound to as strict a compliance with that contract as any other person who enters into a covenant or agreement to do or perform something as a condition precedent to his right of recovery. In cases of this kind, the agent must find a purchaser who is ready and willing to buy at the price and upon the terms proposed by the owner, before he can exact his commission. If he does this, and then the owner prevents the sale by the agent, by interferring and making the sale himself to the purchaser procured by the agent, at the same or even a less price, the agent may recover his commission. But he must comply with the conditions of his contract by procuring a purchaser who is willing and ready to pay the price. Having done that, he has fulfilled his contract whether the sale is actually made or not, provided the failure is the result of the wrongful act of the principal. This is the law laid down in *Reynolds* v. *Tompkins,* 23 W. Va. 229, and it is sustained by the authorities generally. *McFarland* v. *Lillard,* 2 Ind. App. 160; *Gellat* v. *Ridge,* 117 Mo. 553, (38 Am. St. Rep. 683); *Kost* v. *Reilly,* 62 Conn. 57; *Peet* v. *Sherwood,* 47

Minn. 347; *Fraser* v. *Wyckoff,* 63 N. Y. 445; *Charlton* v. *Wood,* 11 Heisk. (Tenn.) 19. Allen, Judge, in *Fraser* v. *Wyckoff,* states the law applicable to this case when he says: "The right to recover in this action rests upon an allegation of performance, and not upon a waiver or prevention of performance by the defendant. The proof comes entirely short of establishing either a performance or an excuse for not performing. The agreement with the broker was very explicit as to the character and terms of the sale to be accomplished as a condition to the earning of commission. The sale was to be absolute, for a specified sum, to be paid to the defendant. The compensation was to be earned when a customer should be obtained who would pay the price named. There is no pretense that such a purchaser has been found, or that such a sale has been made." It is true that the defendant did sell to a man who had previously submitted a proposition to the plaintiff, and this circumstance, no doubt, led the court to give the instructions above quoted and overrule the motion to set aside the verdict, inadvertently assuming that the evidence brought the case within the principle announced in *Reynolds* v. *Tompkins.* But there is no evidence tending to show that the purchaser would have paid a price sufficiently large to enable the plaintiff to make his commission on the sale. The plaintiff himself does not testify to any such possibility, much less a probability, and there is no circumstance disclosed by the evidence from which the jury could have inferred that the plaintiff had found, in the person of Lowe or any one else, a man who would pay such a price for the property.

On account of the misleading character of the instructions given, and the want of sufficient evidence to support the verdict, the judgment must be reversed, the verdict set aside, a new trial granted, and the case remanded.

*Reversed.*