# CHARLESTON.

## STATE *v.* MADISON.

### Decided March 9, 1901.

1. CRIMINAL TRIAL—*Continuance—Evidence Material.*

    To reverse a conviction because of refusal to delay or continue the trial to enable the accused to learn whether evidence exists material to the defense, it must appear clearly that the court abused its discretion, and that its action is plainly erroneous. It must appear that such material evidence existed, and would likely be produced, and the witness expected to give it must be named, and some reasonable ground must appear for the expectation that the evidence exists and will be produced. A mere hope of finding such evidence, based on no tangible substantial ground, will not do. (p. 97).

2. PRISONER'S CHARACTER—*Proper Evidence.*

    The good character of an accused party in respect of the trait involved in the act imputed to him, where intent is essential to its criminality, is admissible, whether the guilt of the accused be doubtful or not. (p. 100).

3. SELF DEFENSE—*Character of Deceased.*

    The bad character of a murdered man is not admissible on the trial of his murderer, where there is no physical altercation and no question of self-defense involved in the case. (p. 101).

Error to Circuit Court, Fayette County.

Lud Madison was convicted of murder, and brings error.

*Affirmed.*

E. G. PIERSON and R. J. THRIFT, for plaintiff in error.

ATTY. GEN. RUCKER and L. C. ANDERSON, for the State.

BRANNON, PRESIDENT:

Lud Madison was sentenced to death by the criminal court of Fayette County for the murder of Peter Suader, and having been refused a writ of error by the judge of the circuit court, obtained such writ from a judge of this Court.

One assignment of error is, that the court did not give the accused time to consult his attorney, but forced him into trial without time to prepare his defense. About three o'clock P. M. the

prisoner was asked by the court if he had any counsel, and he said that he understood that a certain law firm had been employed to represent him, and that firm refusing to do so, the court appointed three attorneys to defend the prisoner, one of whom had been appointed by the court several days before, and after spending from fifteen to twenty minutes in private consultation with the prisoner, the attorneys asked the court to give them until the next morning to consult with their client and learn whether witnesses could be found who knew any facts material to the prisoner concerning the homicide; but the court refused to grant the delay, and went on with the trial. It seems to us that the court should have exercised its discretion otherwise; but that is not our question. The question here is whether it is cause for reversal of the judgment. If we could see that any evidence for the accused was in existence or attainable, we might say he was prejudiced by this haste, and we could see some force in this complaint; but not a person was suggested as a probable witness; not one matter which the accused could prove, or expected to prove, as required by law. *Hurd's Case,* 5 Leigh 715. We cannot reverse when we can see no object to be attained by it. We must have something of substance on which to reverse a solemn trial. If we treat this matter under the law of continuance, this point must be ruled against the prisoner. *State* v. *Lane,* 44 W. Va. 731, is much akin to this case, though stronger for a continuance, and it was held in that case that refusal of a continuance will not justify reversal, unless plainly erroneous. A continuance must have some tangible ground, some probability that it will further the ends of justice, not a mere desire of postponement, not a mere hope that something may possibly develop for the party's interest, but a well founded belief that evidence will come to light, and that belief must be grounded on known facts. *State* v. *Harrison,* 36 W. Va. 729; *State* v. *Maier, Id.* 769. We can not only say that the accused gave no ground to enable the court to see that a delay of a few hours would reveal any evidence, but we can go further and say that such delay, or even a continuance for the term, would have done him no good; for when we look at the facts shown, unquestionably, we can, to a strong moral certainty, assert that no evidence to defeat or mitigate the charge was attainable. Four colored coal miners roomed in a shanty together, the prisoner, the deceased and Charles and Joe Jordan. The deceased and the

prisoner played checkers until bed-time. When they were about to go to bed, as proven by Charles Jordan, Suader asked for a piece of bread, and Madison told him to cook his own bread. Jordan says: "Peter went on in the other room, and Madison says directly, 'I am feeding the bread to the hogs now,' and Suader says, 'You do that because you don't want me to have it,' and Suader says, 'I don't want none of your damn bread,' and Madison says, 'Don't you cuss me,' and he (Suader) says, 'Don't you like it?' and Madison says, 'No,' and Suader says, 'Don't take it then.'" This represents the sum total of Suader's offense and the whole trouble. Madison had loosed his suspenders for the night, but at once upon this verbal altercation went out, remained nearly an hour, procured a pistol, and returned to the shanty about half after ten o'clock, and found Suader and the two Jordans in bed. Jordan asked him to come to bed, and Madison said no, that he was going to write a letter to his mother, and he sat down at a table at the foot of Jordan's bed and wrote a letter to his mother, and also a letter to Charles Jordan, who was asleep in the bed. We do not know what the letter to his mother contains, as Jordan mailed it to her next day, but the one to Jordan was found on the floor by Jordan's bed. It reads: "Charlie, I will ask you to draw my money and send it to my mother, Emily Madison, Green Bay, Virginia. Charlie, I hate to leave you. I don't like it. I will not take Peter's cursing. I am no dog. I hope the Lord will be with you all. This is from your friend. Madison."

"Mail my letter. Mr. Charlie Jordan"—on the back.

This shows sedate purpose to do the murder. Madison waited till all were asleep, and then shot Suader through the lungs and heart while asleep and helpless, about one o'clock, and fled in the darkness of the night, satchel in hand, and was apprehended at Hinton, in an adjoining county, while walking the railroad track on his way to Virginia, and when arrested gave the officers his name as "Will Howald." In his haste he left the door of the shanty open. He had had several hours to cool after the slight disagreement between him and Suader. He asked the arresting officer where the shooting had been done, and being informed that it was on Laurel Creek, Madison said nothing for a little while, but when the officer asked him why he shot the man, Madison replied, "Because he cursed me." At another time and place, while riding along the road while being conveyed back

to Fayette County, where the murder occurred, Madison confessed to another officer, a constable of Fayette County, in the presence of a justice, saying, "I shot him because he cursed me." The evidence clearly shows these facts. No one else was present in the shanty. How can we say, with any reason, that Madison could show anything to the contrary? He named no one else as present, suggested no witness or matter which he could prove. How can we say he was prejudiced by this delay? This murder was in May, and Madison was arrested next day, and the trial began 26th of October, lasting three days. Thus, Madison and his friends had months to prepare the defence, to learn facts, to summon witnesses. It is a rule that a man cannot have a continuance without showing diligence in preparation.

A second assignment of error is, that the court did not give compulsory process for Harrah as a witness, and forced the trial without his presence. This assignment is unsustained by the facts. The court did award process for this witness on the first day of the trial, adjourned it till the next morning, then till the afternoon, when inquiry of the sheriff revealed that Harrah had not been summoned, and no effort by the sheriff to summon him, and the court went on with the trial. The question is, is the prisoner entitled to a new trial for this cause? If we consider it under the law of continuance just stated, it is not sufficient. The accused knew this constable Harrah, to whom he made the confession. Surely he could, in months, have had him summoned. Counsel say they first learned on the examination of the justice who heard the confession of Madison, the importance of Harrah on the subject of inducement held out to the prisoner to confess; but the attorneys do not state in what that importance consisted, nor do they say that they knew, (they could not know), what evidence Harrah would give, nor that they had ever talked with Harrah, and they gave no ground whatever to enable a court to say that Harrah would prove anything for the prisoner. Counsel stated that they wanted Harrah "for the purpose of ascertaining and proving, if possible, that inducements were offered to the prisoner." This was mere hope, mere experiment. The justice who was present when the confession to the constable was made disproves any inducement to confess. The prisoner even made no affidavit as to Harrah, or what Harrah knew, or what the prisoner expected to prove by him. Would he prove inducements? We cannot even guess. No one asserts

that he would.  There is not a basis for even a hope that he
would.  Judging from two other witnesses we may say that he
would not, as they negative inducement.  And even if induce-
ments were held out by Harrah, there is a distinct confession to
William Yancey, the marshal of Hinton, free from any induce-
ment.  The first confession was this one, and it was after a con-
siderable interval repeated to Harrah and Cox, which would
likely admit the second confession, even if made under induce-
ment.  *Thompson's Case,* 20 Grat. 724.  But that first confes-
sion, proven to have been without inducement, would sustain the
verdict.  *Mitchell's Case,* 33 Grat. 845.  Suppose we apply to
this point the principal of law applicable to motions for new
trials and after discovered evidence, as we should.  It will not
stand that test.  Such evidence must be such as could not have
been discovered by reasonable diligence, must be material and
such as ought to produce a different verdict.  *State* v. *Betsall,*
11 W. Va. 703.  And the evidence must be set out in an affidavit
as it can be testified to on another trial.  *State* v. *Williams,* 14
W. Va. 851; *Strader* v. *Goff,* 6 *Id.* 258.  Surely, Madison knew
what Harrah had said to him, if anything, by way of inducement
to confess; but he took no steps in months to summon Harrah, a
fact which confirms the belief that Harrah would prove no in-
ducement.  Madison did not himself so claim.  And there is no
showing of what Harrah would prove or was expected to prove.

The third assignment of error is, that the court refused to
strike out the evidence of Cox and Yancey, proving Madison's
confession of the murder.  This assignment is based on the idea
that there was inducement to confess.  There is no evidence of
it.  The evidence of two witnesses negative any inducement.

The fourth assignment of error rests on the refusal of an in-
struction that the jury could consider the good character of Mad-
ison, and the bad character of Suader.  There was some evidence
that Madison had a good reputation for peace and quietude, and
a morsel, a mere morsel, of evidence from one witness that
Suader had a bad reputation as to peace.  It was really no evi-
dence.  It is not shown to be based on general reputation, and
the witness did not personally know Suader.

As to the character of the accused.  It may be said that once
the rule was that it is only in cases where the evidence is circum-
stantial, and the question whether the accused did the act, that
evidence of good character is admitted; but the prevalent rule

now is that evidence of good character in respect to the trait involved in the act, where criminal intent is essential, is always admissible. Whart. Crim. Ev. ss. 57, 60, 66; 1 Greenl. Ev. s. 14*b* (16 Ed.); 3 Greenl. Ev., s. 25; *Linecum* v. *State,* 25 Am. St. R. 727; *Hopp* v. *People,* 83 Am. Dec. 231. But the question of the admissibility of such evidence is not before us, as it was in fact admitted. Had it been rejected, likely it would be error. The complaint is only that the court did not tell the jury that it was authorized to consider such evidence. We are asked to reverse, not for an instruction given, but for refusal to give one; and not for refusal to lay down a proposition of law to which the party is entitled on the facts shown by evidence, but merely for failure to tell a jury that it had authority to consider evidence, which the court had already plainly done by admitting that evidence. It need no such instruction. And, besides, it seems unreasonable to ask a reversal simply for the refusal of such an instruction when we see that the facts and circumstances point indubitably to the prisoner as the guilty agent of this murder, and the accused admitted it. Whilst such character evidence is proper to go before a jury, yet as to its weight courts have over and over said that when evidence of guilt is positive and unimpeached, the character of the accused can avail nothing. *People* v. *Vane,* 12 Wend. 78; *Wesley* v. *State,* 75 Am. Dec. 62. Hence, it would seem ludicrous to overthrow a trial when we see that it has been fair and that justice has been done, and that the presence of that instruction could not possibly have produced another result.

As to that feature of the instruction saying that the jury had a right to consider the bad character of the deceased. There was no evidence of it, and such evidence as there was was before the jury. But the jury could not consider it for the reason that the bad character of a person killed cannot be considered where there is not the minutest particle of evidence to show any altercation, any necessity of self-defense. 3 Greenl. Ev., s. 27. It is only where the right of self-defense is involved under the evidence that the bad character of the deceased as to peaceableness is competent. Whart. Crim. Ev., s. 68; *Gardner* v. *State,* 35 Am. St. R. 202 and note. Even when one threatened another, it was held that the dangerous character of the deceased was not admissible "where it is shown that the prisoner sought him out and shot him, without attempt on his part to execute his threat." *Pritchett* v. *State,* 58 Am. Dec. 250. Suader had given, say, a

very slight affront, no threat, hours before, had gone to bed and was in peace in the depth of sleep. Madison goes out late at night to get a pistol to kill Suader, staying an hour, returns and calmly writes two letters, and having packed his satchel and prepared for departure, for flight, everything ready, goes to Suader's bed and shoots him while asleep through the heart. The dying man's loud groans of pain and anguish aroused the sleeping Jordans. How can we say that the bad character of Suader could be considered?

Another assignment is the separation of the jury. One of the attorneys says that while the jury was in charge of the officer in a large room in a hotel, one juror went into the washroom in which was the water closet. Suppose he did. We held in *State v. Harrison,* 36 W. Va. 729, that mere separation will not vitiate a verdict, and that when a juror went into a water closet, the sheriff being near, as in this case, it would not affect a verdict. In this case there is no showing that the juror saw or talked with anybody in the washroom. But the officer swears flatly that no such separation as alleged took place.

We must affirm the judgment.

*Affirmed.*