# CHARLESTON.

STATE *v.* RUSH CLINE

(No. 5298)

Submitted September 29, 1925.   Decided October 6, 1925.

1. HOMICIDE—*Evidence of Malice in Shooting Held Sufficient to Sustain Verdict of Murder in Second Degree.*

In a murder trial where the evidence establishes that the accused, having information of threats against his life made by the deceased, an alleged paramour of the accused's wife, habitually carried a pistol after he had heard of the threats, and perceiving the deceased in conversation with another, called him aside, and after a brief conversation kills him by firing shots into his back as he attempts to turn away, and seeks to justify the killing, not upon grounds of self-defense, but upon the alleged ground that the deceased admitted having had sexual intercourse with the wife of the accused, and that deceased had broken up his home, a verdict of murder in the second degree will not be set aside on the ground that no malice has been shown and cannot be inferred.   (p. 61.)

(Homicide, 30 C. J. § 537).

2. SAME—*Instructing Jury as to Verdict Which They May Return Under Indictment for Murder, Punishments Under Various Verdicts to Which Accused Will be Subjected, or That They May Acquit, Held Not Error.*

In such case it is not error to tell the jury the verdicts which they may return under the indictment, the punishments under the various verdicts to which the accused will be

subjected, or that they may find a verdict of not guilty, if the evidence in their opinion warrants such findings. '(p. 60.)

(Homicide, 30 C. J. § 669).

3. CRIMINAL LAW—HOMICIDE—*Good Character of Accused With Respect to Trait Involved in Criminal Act With Which He is Charged Held Admissible, if Intent With Which He Committed Act is at Issue; on Admission of Criminal Act, if Excuse is Not Sufficient in Law, and More Favorable Verdict Could Not Have Been Reached, Refusal to Instruct That Jury Might Consider Character Evidence to Determine Accused's Guilt or Innocence Was 'Not Sufficient to Set Aside Conviction.*

Good character of the accused with respect to the trait involved in the criminal act with which he is charged, is admissible where the intent with which he committed the act is at issue, whether the guilt of the accused be doubtful or not. But where the criminal act is admitted by the accused, and the reason and excuse for its commission is not sufficient in law, and from the whole case a more favorable verdict for the accused could not have been reached properly, the refusal of an instruction telling the jury they might consider and weigh character evidence in determining the guilt or innocence of the accused, will not be sufficient to set aside the verdict.    (p. 62.) .

(Criminal Law, 16 C. J. § 1129; Homicide, 30 C. J. § 595).

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Mingo County.

Rush Cline was convicted of murder in the second degree, and he brings error.

*Affirmed.*

*Stafford & Rhodes,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, PRESIDENT:

Defendant Rush Cline was tried at the April Term, 1924, of the Circuit Court of Mingo County, upon an indictment charging him with the murder of Corbet Mounts. The jury returned a verdict of second degree murder, and on May 2,

1924, he was sentenced to serve eight years in the penitentiary. This writ followed.

The errors relied upon for reversal are: (1) The court erred in refusing to set aside the verdict and grant a new trial, because the evidence does not justify a verdict of more than voluntary manslaughter; (2) The court erred in giving State's instruction No. 1, so far as it refers to the different degrees of homicide, and in stating to the jury that under the indictment in this case, if the evidence so warranted, they could render a verdict of murder in the first or second degrees; and (3) The court erred in refusing to give defendant's instruction No. 1 touching upon the character and general reputation of defendant as a peaceable and law-abiding citizen.

A consideration of the points of error relied upon for reversal, renders necessary a brief summary of the evidence. Rush Cline, the defendant, was employed as a miner in the coal mines at War Eagle and had been so employed for a number of years. He was a married man with a wife and two small children. About two months before the fatal shooting, Corbet Mounts, during Cline's absence at work in the mines, began paying visits to defendant's home to see the latter's wife. As a result, Mounts and the defendant's wife became intimate. From the evidence of witnesses for defendant, it appears that after the formation of this "eternal triangle", Mounts became desirous of getting Cline out of the way, and made threats to that effect, which threats were communicated to defendant a short time prior to the shooting. Defendant's wife also testified that Mounts had endeavored to get her to poison Cline. She had not communicated this fact to defendant. About two weeks before the homicide took place, defendant learned from his mother of the alleged intimacy existing between the deceased and defendant's wife. Under questioning from the defendant, the wife denied the truth of the reports. At the time of the killing, defendant with his two small children was living with his mother, and his wife was staying at the home of her mother.

The fatal shooting took place on December 4, 1924, between 4:30 and 5 o'clock P. M. Defendant was returning

from work, and as he neared his mother's dwelling, he observed Henry Bradford and the deceased, Corbet Mounts, standing in the door of a barn belonging to the War Eagle Coal Company, which barn was just across the railroad tracks from his mother's home. The defendant called Mounts out and the two engaged in a conversation. The noise from a nearby power house made it impossible for witnesses to the shooting to hear this conversation. The deceased and defendant were facing each other at a distance of about five or six feet. After talking a few minutes, defendant removed a dinner pail from his arm, pulled off his gloves and unburdened himself of a hammer which he was carrying, and turned these articles over to his little brother who came out from the house across the way. The conversation had lasted about five or six minutes, when defendant drew a revolver from his hip pocket and fired point blank at the deceased. The first shot ranged upward, probably missing the deceased or hitting his hat, but several other shots found their mark in Mount's back as he was turning away from defendant. The wounded man staggered on for a few feet, sank down by the railroad track and expired. A search of the decedent's clothing revealed a closed pocket knife, some cartridges and several other articles.

Defendant had been carrying the revolver with which the shooting was done, about two weeks, but testified that he had not made a practice of carrying a pistol until the threats made by Mounts had been communicated to him.

Defendant further testified that during his conversation with deceased, he had asked him as to the intimacy said to have existed between him and defendant's wife, and that Mounts had replied that he had had intercourse with her, and that "he was going to take her on further"; that if defendant interfered with him when he went to go further, he would kill him there. The accused also stated that the shooting was not in self-defense; that the cause of the shooting was that "he had tore up my home and I knowed it, and I was all tore up and killed him for that".

As mentioned heretofore, two of the points of error relied upon for reversal are: that the court erred in refusing to set

aside the verdict and grant a new trial, on the ground that the evidence does not justify a verdict of more than voluntary manslaughter; and that the court erred in giving State's instruction No. 1, so far as it refers to the different degrees of murder, and in stating to the jury that under the indictment they could find five verdicts; first degree murder, second degree murder, voluntary manslaughter, involuntary manslaughter and not guilty, as the evidence in the case warrants. The point insisted upon as error in this instruction is that it tells the jury that if the evidence so warrants they may find a verdict of murder in either the first or second degrees, stating the punishments which the law imposes under each; and that the evidence does not warrant a conviction of murder in either degree, as no malice can be inferred; wherefore, it was error to instruct upon either degree of murder, and this was prejudicial.

Does the evidence warrant a finding of second degree or first degree murder? We believe that there was sufficient evidence to have warranted the jury in returning a verdict of guilty of murder in either the first or second degree. Granting, but not at this point deciding, that the provocation relied upon by defendant that, "he had tore up my home and I knowed it, and I was all tore up and killed him for that," was sufficient to reduce the killing to manslaughter; yet there was enough evidence from which the jury might have found that the shooting was murder in the first degree—done wilfully, maliciously, deliberately, and premeditatedly;—or murder in the second degree—done with malice, but without premeditation or deliberation. No one heard the conversation that took place between the deceased and defendant, except the two principals. The jury had a right to disbelieve the testimony of the defendant as to what was said by the deceased during the course of that conversation. There was sufficient evidence from which the jury could find that the killing was done with malice. And also they would be justified in believing that the defendant had armed himself with a revolver and had sought out the deceased and had provoked a quarrel, with the previously conceived plan of killing the deceased. The evidence being sufficient upon which to base

a verdict of either first or second degree murder, we perceive no error in the first two points relied upon by defendant.

We now come to the third point of error relied upon for reversal, namely, that the court erred in refusing to give defendant's instruction No. 1, touching upon the character and general reputation of defendant as a peaceable and law-abiding citizen. This instruction was as follows:

"The court instructs the jury that the law presumes the prisoner innocent, and that in determining the question of the defendant's guilt or innocence in this case, it is the duty of the jury to consider and weigh all the evidence that has been introduced, including that tending to establish the good character of the defendant".

It is the law of this State that the good character of an accused in respect to the trait involved in the act imputed to him, where intent is essential to its criminality, is admissible, whether the guilt of the accused be doubtful or not. *State* v. *Madison*, 49 W. Va. 96. Such evidence being admissible and there having been evidence of the defendant's good character adduced in this case, defendant's instruction No. 1 should have been given. *State* v. *McDermott*, 99 W. Va. 220; 128 S. E. 108. But was the failure so to do, prejudicial error? The accused admitted the killing. He does not claim self-defense. His sole defense was the provocation arising out of his conversation with the deceased, the confirmation of a belief that the deceased "had tore up my home". In such a case good character alone will not justify an acquittal. It may, however, be considered along with all the other evidence in the case in determining the degree of guilt. Hence it was admissible to reduce the admitted crime from first degree murder to second degree murder, and an instruction to consider it for that purpose would have been proper. The jury, no doubt influenced by the character evidence admitted and by the circumstances which actuated the crime, found him guilty of the lesser offense, rendering the error, if any, non-prejudicial. What other evidence was there in this case along with which the good character could have been considered in arriving at a verdict of manslaughter? If there

was not such other evidence, the accused was not prejudiced by the failure to give the character instruction.

Counsel for defendant contends that there was evidence of a sufficient provocation to reduce the killing to manslaughter; that when Mounts told the defendant he had had sexual intercourse with his wife and that he intended to take her away from him, and if he attempted to interfere he would kill him, hot blood was aroused, and that the law in regard for the frailty of human nature would take this fact into consideration in determining his degree of guilt. It is argued that the statement made by Mounts would be equivalent to defendant's seeing his wife in the embrace of her paramour, or of seeing them committing the act of adultery. We cannot accede to this contention. The high regard which the law holds for human life forbids it. "If a husband detects his wife in the act of adultery, there is sufficient provocation to reduce the homicide to manslaughter if he immediately kills either the wife or her paramour, provided that the killing is due to passion aroused by the provocation and not to revenge or malice. In many cases it is held or said that he must see them together under circumstances reasonably leading him to believe that they are or have been so engaged, *and not kill merely upon information of past adultery".* 29 C. J. Sec. 125, page 1142.

We do not believe the statement attributed to the deceased was sufficient provocation to justify the reduction of the defendant's crime from murder to manslaughter. There can be no doubt that if such a statement was made, it would tend to greatly arouse the defendant's anger, but where a homicide has been committed with a deadly weapon, proof of mere words, however insulting or opprobious, is not enough to purge the crime of malice and reduce it to manslaughter. *State* v. *White,* 81 W. Va. 516; *State* v. *Murphy,* 89 W. Va. 413, 109 S. E. 771.

There not having been a sufficient provocation the belief in the existence of which may have been strengthened by the consideration of the evidence of the good character of the defendant, and there being no other evidence along with which the good character of the defendant might have been

considered in arriving at a less degree of guilt than second degree murder, we cannot hold that the court has committed prejudicial error in refusing to give the requested instruction. *State* v. *Smith*, 97 W. Va. 313 and cases there cited. As was said by Judge BRANNON in the case of *State* v. *Madison*, 49 W. Va. 96, ''And, besides, it seems unreasonable to ask a reversal simply for the refusal of such an instruction when we see that the facts and circumstances point indubitably to the prisoner as the guilty agent of this murder, and the accused admitted it. Whilst such character evidence is proper to go before a jury, yet as to its weight courts have over and over said that when evidence of guilt is positive and unimpeached, the character of the accused can avail nothing. *People* v. *Vane*, 12 Wend. 78; *Wesley* v. *State*, 75 Am. Dec. 62. Hence, it would seem ludicrous to overthrow a trial when we see that it has been fair and that justice has been done, and that the presence of that instruction could not possibly have produced another result.''

The judgment of the Circuit Court will be affirmed.

*Affirmed.*