STATE OF WEST VIRGINIA

*v.*

KESTER COLLINS

(No. 12854)

Submitted January 26, 1971.      Decided February 23, 1971.

Dissenting Opinion March 22, 1971.

*Slaven, Staker & Smith, Zane Grey Staker, Ronald J. Rumora, John M. Richardson,* for plaintiff in error.

*Chauncey H. Browning, Jr.,* Attorney General, *George E. Lantz,* Deputy Attorney General, for defendant in error.

HAYMOND, JUDGE:

At the September term, 1968, of the Circuit Court of Mingo County, West Virginia, the defendant, Kester Collins, was indicted for the murder of Robert Evans and on October 1, 1968, upon his arraignment entered his plea of not guilty. Upon the trial of the case the jury returned a verdict of guilty of voluntary manslaughter on October 4, 1968. The court overruled the motion of the defendant to set aside the verdict and grant him a new trial and by its final judgment rendered October 28, 1968, sentenced the defendant to confinement in the state penitentiary for a term of from one year to five years. To that judgment this Court granted this writ of error and supersedeas upon the petition of the defendant and on January 26, 1971 the case was submitted for decision upon the record and the printed briefs and the oral arguments of the attorneys in behalf of the respective parties.

On and prior to May 18, 1968, the defendant, Kester Collins, a married man forty-five years of age at the time of the trial and the father of two teen-age children, was the owner and operator of a beer tavern in a remote section of Mingo County near the village of Breeden. The building in which the tavern was located consisted of a large room with adjoining living quarters in which the defendant and his family made their home. The large room in which the trouble occurred which resulted in the death of Robert Evans and his brother Riley Evans during the night of May 18, 1968, was approximately 23 feet in length and approximately 17 feet in width. At one

end of the room near the adjoining living quarters was a bar 11 feet in length and 2 feet and 3 inches in width, the top of which was "chest high" above the floor. The room also contained a juke box, a pop machine, tables and several seats used in serving patrons and there was a window located some distance from the juke box.

Some time between eight and ten o'clock on the night of May 18, 1968, Robert Evans and Riley Evans, accompanied by their friend Tiny Spaulding, came into the tavern and ordered and drank a quantity of beer and mingled with about one-half dozen other persons who were in the tavern at that time. Robert Evans and Riley Evans had formerly lived in Mingo County but for several years had made their residence in Columbus, Ohio, and at intervals they returned to Mingo County for short visits. They had come to Mingo County to assist in the burial of a cousin who had been killed in a recent automobile accident. The exact age of the Evans brothers does not appear in the record, but they were younger than the defendant, who testified that he had known them during all their lives.

About forty-five minutes or an hour after the Evans brothers had arrived at the tavern, John L. Marcum, Jr., also known as Junior Marcum, a former law enforcement officer of Mingo County, accompanied by James Spry and three women, Loretta Workman, Florence Vance, and Laura Thompson, came into the tavern and Marcum ordered four beers and a soft drink for himself and his companions. At the time Marcum ordered the beer the defendant was at or behind the bar. Immediately before Marcum entered the tavern, Robert Evans went to the bar and told the defendant that he was "going to whip" Marcum and that the defendant "had better stay out of it". While Marcum was at the bar and was about to receive the change from his purchase, Robert Evans, according to the testimony of Marcum, walked up to Marcum and asked him if he knew Robert Evans to which Marcum replied that he did and at that time Robert Evans knocked Marcum to the floor. Marcum grabbed Robert Evans by his waist and "pulled myself up". Robert Evans began to choke him and when

Marcum tried to break the grip he was beaten about the head with a pop bottle and was temporarily rendered unconscious.

The defendant's version of the fight was that after Robert Evans had told him that he was going to whip Marcum and had asked Marcum if he wanted to fight and if he knew Robert Evans and after the defendant had told Robert Evans not to start any trouble if he could keep from it and not to bother "nobody" and "to stay out of it", Robert Evans struck Marcum in the eye and then "got a choke hold around his neck" and they grappled and fell to the floor.

While the fight was in progress Riley Evans beat Marcum about the head with bottles that he apparently had taken from a nearby container. Marcum was severely beaten, was bleeding about the head, was rendered unconscious for a short time and finally, when the fight ended, crawled away from the place where the fight had occurred. Robert Evans who wore a white shirt but no coat was smaller than his brother Riley Evans who wore a blue shirt but also wore no coat.

The defendant testified that while the fight was in progress he unsuccessfully called upon the participants to stop the fight; that he tried "to get a hold of them, with no success, and every time I would start in on them, why, Riley would draw back with a bottle like he was going to smack me with it, and I kept circling around and trying to get a hold of them, and nobody made no effort to help me break it up, and everybody hollowing 'Stop, stop, stop it, stop it' ". He also testified that Robert Evans kicked him back into the nearby juke box and that at that time, fearing that if the fight were not immediately stopped the Evans brothers would kill Marcum, he ran to the living quarters in the rear of the tavern building, got a forty-five automatic pistol from under the mattress of his bed, returned to the tavern from the living quarters and fired a warning shot through the juke box and a second warning shot through the window.

After the second warning shot, Riley Evans, who was standing facing the defendant with a pop bottle in his raised

hand, moved his other hand toward his pocket and took a step toward the defendant who was a short distance away and behind the bar which was between him and the Evans brothers, and Robert Evans, who was on the floor beating Marcum, turned from Marcum, got up from the floor, turned toward the defendant and put one hand toward his pocket. At that time the defendant fired five shots in rapid succession at the Evans brothers all of which struck them and caused their death. Robert Evans was killed almost instantly and Riley Evans died within a few minutes after he was shot. After firing the shots the defendant told the other persons in the tavern not to say or do anything and he held the pistol in his hand facing them for several minutes. Some time later, he took the pistol, reloaded it, and placed it in a refrigerator in the living quarters and told his son to call the police. The nearest officer who could be reached by telephone was located about two and one-half miles from the tavern. Several police officers began to arrive at the tavern about one o'clock on the morning of May 19, and they conducted or participated in an investigation of the tragedy.

When the shooting occurred, in addition to the defendant, the Evans brothers and Junior Marcum, at least eight other persons were present. They were: Florence Vance, Loretta Workman, Laura Thompson and James Spry, who had come to the tavern with Marcum; Tiny Spaulding, a cousin and companion of the Evans brothers and a brother-in-law of the defendant; Charles Clay, who before the shooting had played some tunes on a guitar; and Ott Baisden and Josephine Baisden, husband and wife, who were close friends of the defendant. Five eye witnesses, Vance, Workman, Spaulding, Clay and Thompson testified as witnesses in behalf of the State, and Marcum, the Baisdens, who were also eye witnesses, and some character witnesses testified in behalf of the defendant.

The Baisdens testified that the defendant came from behind the bar and tried to stop the fight between the Evans brothers and Marcum before he went for the pistol; but none of the five eye witnesses in behalf of the State testified that the defendant did anything to stop the fight before he fired

the two warning shots and none of them gave any evidence of any threat or hostile act by Robert Evans or Riley Evans against the defendant. Vance, Workman, Spaulding and Clay each testified that the defendant refused to permit any of the persons present in the tavern to render any assistance to the Evans brothers before their death.

Though some testimony of the defendant and the testimony of other witnesses varies as to the number of shots, the evidence, including the testimony of the defendant, establishes clearly that the defendant, while the fight was in progress, fired two warning shots with a short interval between them, and that after another short interval and after the fight had ended, and Riley Evans had turned from Marcum and faced the defendant and Robert Evans had also turned from Marcum and rose to his feet also facing the defendant, the defendant fired five shots in rapid succession from the automatic pistol and that all five shots entered the bodies of Robert Evans and Riley Evans and killed them. The evidence also shows clearly that Marcum was the victim of an unprovoked and vicious attack by Robert Evans, in which Riley Evans joined.

The defendant, Junior Marcum, Ott Baisden, Pinkney Dent, James Marcum, Tom Marcum and Virgil Marcum testified that the general reputation of Robert Evans and Riley Evans as peaceable law-abiding citizens in the community in which the shooting occurred, was bad, but the court refused to permit the defendant to show that Robert Evans and Riley Evans were men of known dangerous and violent character or reputation.

The defendant assigns as error the action of the trial court (1) in refusing to permit the defendant to offer proof that Robert Evans and Riley Evans were men of known dangerous and violent character or reputation; and (2) in refusing to give defendant's Instructions Numbers 7 and 8.

In behalf of the first assignment of error, the defendant contends that inasmuch as he relies upon self-defense to excuse the homicide and as there was evidence which showed

or tended to show that Robert Evans, the deceased, at the time of the killing, was making a murderous attack upon the defendant, the defendant was entitled to prove the character or reputation of the deceased as a dangerous and quarrelsome man. When self-defense is relied upon to excuse homicide, the burden is upon the defendant to prove that defense by a preponderance of the evidence and it may be established by evidence introduced by the defendant or by the State or by both and by all the facts and circumstances shown by the evidence. *State v. Harlow*, 137 W.Va. 251, 71 S.E.2d 330; *State v. Zannino*, 129 W.Va. 775, 41 S.E.2d 641; *State v. Mc-Million*, 104 W.Va. 1, 138 S.E. 732; *State v. Banks*, 99 W.Va. 711, 129 S.E. 715; *State v. Coontz*, 94 W.Va. 59, 117 S.E. 701; *State v. Hardin*, 91 W.Va. 149, 112 S.E. 401; *State v. Panetta*, 85 W.Va. 212, 101 S.E. 360; *State v. Johnson*, 49 W.Va. 684, 39 S.E. 665; *State v. Hatfield*, 48 W.Va. 561, 37 S.E. 626; *State v. Manns*, 48 W.Va. 480, 37 S.E. 613; *State v. Greer*, 22 W.Va. 800; *State v. Jones*, 20 W.Va. 764.

All the evidence in the case, both in behalf of the defendant and in behalf of the State, does not establish the defense of self-defense on which the defendant relied for acquittal, and by its verdict of guilty of voluntary manslaughter, the jury found that self-defense had not been established by the evidence.

This Court has said that even though the State, upon a trial for murder, introduces evidence which tends to show extenuating circumstances, such evidence does not relieve the defendant of the burden of establishing self-defense upon which he relies, that it is the peculiar province of the jury to weigh the evidence on the question of self-defense, and that a verdict of a jury adverse to that defense will not be set aside unless it is manifestly against the weight of the evidence. *State v. Banks*, 99 W.Va. 711, 129 S.E. 715.

Neither Robert Evans nor Riley Evans was armed with a deadly or dangerous weapon. Neither of them at any time made any threats against the defendant or committed any overt act which justified any belief that either of them was about to commit or intended to commit any attack upon the

defendant which would endanger his life or inflict grave bodily injury upon him. According to the testimony of the defendant himself, before he fired any of the five shots, Robert Evans who had been on the floor choking Junior Marcum, had "let go of him", had got to his feet and had taken a step "sort of in the direction of me". He also testified that after Robert Evans had "let go" of Junior Marcum, Robert Evans "made a step kindly like he was going for his pocket and reaching into his pocket or something, and, therefore, I thought they both had guns and they was standing real close together" and that "I thought they was about ready to both let into shooting". When asked to tell the jury why he fired the shots that killed Robert Evans and Riley Evans, the defendant gave this testimony: "When Rile raised up there, he had a pop bottle in his hand. Q. Now, when was that? A. When I fired the second shot, he raised up with a pop bottle in his hand, and he had it— Q. Stand up there and show the jury so they see your waist and your body. A. Sort of had it, sort of in a motion like this. Q. Stand up so you can show the jury. A. And had it in motion, sort of like that. It looked like he was reaching to his belt or his pocket one. Q. And what did you think he was about to do if anything? A. Two things. I thought he was going to throw the bottle and I thought he was going to go for a gun."

The belief expressed by the defendant that Riley Evans was going to throw the bottle and that he was "going to go for a gun" was not a reasonable belief and the jury so found. It was unreasonable to conclude that Riley Evans, armed with only a pop bottle, would throw it at the defendant or strike the defendant with it while the defendant, facing him within a few feet, had a loaded pistol in his hand from which he had already fired two shots. It was likewise unreasonable to believe that either Robert Evans or Riley Evans, neither of whom was wearing a coat or a jacket, was armed with any dangerous or deadly weapon. Though one of the investigating officers who came to the tavern some time after the shooting had occurred, found a blackjack in the jacket of Robert Evans, he did not wear his jacket during the fight or when he was shot. The evidence does not indicate that the defendant

knew of the presence of the blackjack in Robert Evans' jacket or that Evans made any use of the blackjack at any time during his presence at the tavern.

In a trial of a homicide where the accused relies on self-defense and there is appreciable evidence to support his theory, the accused may prove the reputation of the deceased as a dangerous and quarrelsome man, *State v. Walker*, 92 W. Va. 499, 115 S.E. 443; and in a prosecution for murder where self-defense is relied upon to excuse the homicide and there is evidence showing or tending to show that the deceased at the time of the killing was making a murderous attack upon the defendant, it is competent for the defendant to prove the character or reputation of the deceased as a dangerous and quarrelsome man. *State v. Hardin*, 91 W.Va. 149, 112 S.E. 401. As already indicated, there was no appreciable evidence to support the defense of self-defense and no evidence showing or tending to show that either Robert Evans or Riley Evans was at the time of the killing making a murderous attack upon the defendant. Because of the absence of such evidence the defendant was not entitled to show that either Robert Evans or Riley Evans was a man of dangerous and violent character and reputation. The action of the court in refusing to admit evidence of that nature did not constitute error.

When in a prosecution for murder the defendant relies upon self-defense to excuse the homicide and the evidence does not show or tend to show that the defendant was acting in self-defense when he shot and killed the deceased, the defendant will not be permitted to prove that the deceased was of dangerous, violent and quarrelsome character or reputation. In the opinion in *State v. Madison*, 49 W.Va. 96, 38 S.E. 492, this Court used this language: "It is only where the right of self-defense is involved under the evidence that the bad character of the deceased as to peaceableness is competent. Whart. Crim. Ev., s. 68; *Gardner v. State*, 35 Am. St. R. 202 and note. Even when one threatened another, it was held that the dangerous character of the deceased was not admissible 'where it is shown that the prisoner sought him out and shot him, without attempt on his part to execute his threat.' "

Nor did the trial court commit error in refusing to give Instruction Number 7 and Instruction Number 8 offered by the defendant.

Defendant's Instruction Number 7 would have told the jury that the proprietor of a beer tavern licensed under the laws of this State acts unlawfully if he permits disorderly conduct of any kind upon the premises covered by his beer license or permits any act whatsoever to be done which constitutes a crime under the laws of this State and that the defendant in the circumstances in evidence at the time Robert Evans and Riley Evans attacked Junior Marcum, was required by law to take such steps as were reasonably necessary in the light of the existing circumstances to interfere for the purpose of stopping the altercation and restoring order in the licensed beer tavern. It is clear that the foregoing instruction is based on the theory advanced by the defendant that in the existing circumstances he was required by law to interfere and take such action as was reasonably necessary to stop the fight in which the Evans brothers and Marcum were engaged.

Manifestly, the statute, Paragraphs (m) and (p), Section 13, Article 16, Chapter 11, Code, 1931, as amended, which to the extent here pertinent provides that it shall be unlawful (m) for any licensee to permit loud, boisterous or disorderly conduct of any kind upon his premises or to permit the use of loud musical instruments if either or any of them may disturb the peace and quietude of the community in which such business is located * * * and (p) for any licensee to permit any act to be done upon the licensed premises, the commission of which constitutes a crime under the laws of this State, may not be given the force and effect of requiring such licensee to resort to whatever force may be necessary, whether he be armed or unarmed, to quell the disturbance or to subdue the persons engaged in the commission of an unlawful or felonious assault. The word "permit" as used in the statute may not be given that meaning, force or effect. On the contrary, it is clear that the Legislature used that word for the purpose of preventing the licensee from engaging in any of the foregoing acts or permitting persons under his control or other

persons from engaging in such acts upon the premises but was not intended to authorize or require him to use such force as may be necessary to prevent or stop such acts. Clearly it is one thing to refuse to permit certain acts to be done and a totally different thing to require the use of force to prevent and stop such acts. The instruction misstates the law and is misleading and is not supported by the evidence which shows clearly that before the defendant fired any of the final five shots the fight between the Evans brothers and Junior Marcum and the attack upon him had ended and that there was no necessity for the defendant to fire any shots other than the two warning shots to put an end to the disturbance.

Defendant's Instruction Number 8 would have told the jury that a person who sees a serious crime being committed or carried out against another person upon his premises need not stand idly by, but is entitled under the law to take such steps as are reasonably necessary to prevent those engaged in the commission of such crime from carrying their criminal activity any further and that if the jury should find from the evidence that while in the beer tavern of the defendant Robert Evans and Riley Evans made an unprovoked assault upon Junior Marcum in the presence of the defendant and engaged in carrying out such assault so as to cause a reasonable person to believe that serious bodily harm was being inflicted upon Marcum or that the nature of the assault was such as to put him in danger of losing his life, the defendant had the right to interfere and to take all steps reasonably necessary to bring the assault to an end and to arm himself for that purpose but that the defendant acted at his peril and that it is for the jury to determine whether his conduct in the circumstances shown by the evidence was reasonable and necessary. This instruction, like Instruction Number 7, is not sustained by the evidence and tends to mislead the jury and for that reason it was properly refused. The evidence shows clearly that the fight between the Evans brothers and Marcum had ended before the defendant fired the shots which caused their death and that after the fight had ended there was no necessity for him to act as he did to protect Marcum from danger of death or serious injury. As the instruction was properly

refused because not supported by evidence and because it tends to mislead the jury it is unnecessary to consider or determine whether the instruction correctly states the law as to the right of a person to intervene to protect another person whose life is in danger and as to the degree of force he may use to repel the attack of the assailant; and those questions are not discussed, considered or determined.

An instruction which does not correctly state the law is erroneous and should be refused. Point 6, Syllabus, *Sydenstricker v. Vannoy*, 151 W.Va. 177, 150 S.E.2d 905; *Preston County Coke Company v. Preston County Light and Power Company*, 146 W.Va. 231, 119 S.E.2d 420; *Overton v. Fields*, 145 W.Va. 797, 117 S.E.2d 598; *Wilson v. Edwards*, 138 W.Va. 613, 77 S.E.2d 164; *Moore v. Turner*, 137 W.Va. 299, 71 S.E. 2d 342, 32 A.L.R.2d 713; *Gilkerson v. Baltimore and Ohio Railroad Company*, 129 W.Va. 649, 41 S.E.2d 188; *Parrish v. City of Huntington*, 57 W.Va. 286, 50 S.E. 416; *Dorr v. Camden*, 55 W.Va. 226, 46 S.E. 1014, 65 L.R.A. 348; *State v. Morrison*, 49 W.Va. 210, 38 S.E. 481.

It is reversible error to give an instruction which tends to mislead and confuse the jury. *Yates v. Mancari*, 153 W.Va. 350, 168 S.E.2d 746; *Sydenstricker v. Vannoy*, 151 W.Va. 177, 150 S.E.2d 905; *Preston County Coke Company v. Preston County Light and Power Company*, 146 W.Va. 231, 119 S.E.2d 420; *Overton v. Fields*, 145 W.Va. 797, 117 S.E.2d 598; *Hartley v. Crede*, 140 W.Va. 133, 82 S.E.2d 672; *Matthews v. Cumberland and Allegheny Gas Company*, 138 W.Va. 639, 77 S.E.2d 180; *Morrison v. Roush*, 110 W.Va. 398, 158 S.E. 514; *Chaney v. Moore*, 101 W.Va. 621, 134 S.E. 204, 47 A.L.R. 800; *Frank v. Monongahela Valley Traction Company*, 75 W.Va. 364, 83 S.E. 1009; *Parker v. The National Mutual Building and Loan Association*, 55 W.Va. 134, 46 S.E. 811; *State v. Morrison*, 49 W.Va. 210, 38 S.E. 481.

Instructions must be based upon the evidence and an instruction which is not sustained by evidence should not be given. Point 1, Syllabus, *Hollen v. Linger*, 151 W.Va. 255, 151 S.E.2d 330; *Frye v. Norton*, 148 W.Va. 500, 135 S.E.2d 603; *Payne v. Kinder*, 147 W.Va. 352, 127 S.E.2d 726; *Maynard v.*

*National Fire Insurance Company of Hartford,* 147 W.Va. 539, 129 S.E.2d 443; *State v. Vance,* 146 W.Va. 925, 124 S.E.2d 252; *Henthorn v. Long,* 146 W.Va. 636, 122 S.E.2d 186; *State ex rel. Shatzer v. Freeport Coal Company,* 144 W.Va. 178, 107 S.E. 2d 503; *State v. Morris,* 142 W.Va. 303, 95 S.E.2d 401; *State v. Cirullo,* 142 W.Va. 56, 93 S.E.2d 526; *Mulroy v. Co-Operative Transit Company,* 142 W.Va. 165, 95 S.E.2d 63; *Rees Electric Company, Inc. v. Mullens Smokeless Coal Company,* 141 W. Va. 244, 89 S.E.2d 619; *Ward v. Smith,* 140 W.Va. 791, 86 S.E.2d 539; *Higgs v. Watkins,* 138 W.Va. 844, 78 S.E.2d 230; *Wilson v. Edwards,* 138 W.Va. 613, 77 S.E.2d 164; *Thrasher v. Amere Gas Utilities Company,* 138 W.Va. 166, 75 S.E.2d 376; *Ballengee v. Whitlock,* 138 W.Va. 58, 74 S.E.2d 780; *Cato v. Silling,* 137 W.Va. 694, 73 S.E.2d 731, *certiorari denied,* 348 U.S. 981, 75 S. Ct. 572, 99 L. Ed. 764, *rehearing denied,* 349 U.S. 924, 75 S. Ct. 659, 99 L. Ed. 1256; *Chesapeake and Ohio Railway Company v. Johnson,* 134 W.Va. 619, 60 S.E.2d 203; *Davis v. Pugh,* 133 W.Va. 569, 57 S.E.2d 9; *State v. Humphreys,* 128 W.Va. 370, 36 S.E.2d 469; *Neal v. City of Bluefield,* 105 W.Va. 201, 141 S.E. 779; *Morgan Lumber and Manufacturing Company v. Surber,* 104 W.Va. 308, 140 S.E. 12; *Roberts v. Lykins,* 102 W.Va. 409, 135 S.E. 388; *Wilson v. McCoy,* 93 W.Va. 667, 117 S.E. 473; *Williams v. County Court of Lincoln County,* 90 W.Va. 67, 110 S.E. 486; *Penix v. Grafton,* 86 W.Va. 278, 103 S.E. 106; *Bond v. National Fire Insurance Company,* 77 W.Va. 736, 88 S.E. 389.

The judgment of the Circuit Court of Mingo County is affirmed.

*Affirmed.*

BROWNING, JUDGE, dissenting:

I dissent. It is with deference that I find myself in firm disagreement with the majority in holding that this defendant had a fair trial and affirming the judgment of the Circuit Court of Mingo County upon the jury verdict finding the defendant guilty of voluntary manslaughter. It is my opinion that the trial court committed reversible error in refusing to permit the defendant to prove that, prior to the killing,

Robert Evans and Riley Evans were men of known dangerous and violent reputation. I am also of the opinion that it was prejudicial error for the trial court to refuse Defendant's Instructions Nos. 7 and 8, although if either had been given perhaps the error as to the other would have been cured. I am particularly concerned with the failure of this Court to find that it was reversible error to refuse, upon objection of the State, to give Defendant's Instruction No. 8. Although counsel for the plaintiff in error did not assign as error the giving of certain instructions by the trial court when such instructions were given over the objection of counsel for the defendant during the trial, this Court should have, as it has a right to do, judicially noticed the prejudicial nature of the giving of those instructions and at least considered them upon this writ of error. See *State v. Bragg*, 140 W.Va. 585, 87 S.E.2d 689 (1955). The giving of those instructions was so palpably prejudicial as to deny him the fair trial which he is guaranteed by the Constitution of the United States and of this State. In particular I refer to State's Instructions Nos. 3, 5 and 7, even though the objection to No. 5 was somewhat conditional.

It is apparent from the brief of the Honorable Chauncey H. Browning, Jr., Attorney General of this State and, from the opinion of the majority that neither recognized that there were two fundamental legal principles at issue in the trial of this case: (1) whether the defendant had the right or duty to intervene under the circumstances revealed by the record; and (2) whether the defendant was justified in killing the deceased Robert Evans upon the ground of self-defense. The trial court was laboring under no such delusion and made specific rulings as to each issue. It is interesting indeed to note that the prosecutor objected to the giving of Instruction No. 8 upon the ground that it was "not a self defense instruction," the trial court refused to give the instruction upon another ground, hereinafter to be stated, and the majority found the instruction objectionable upon yet another ground. In refusing the instruction, the trial court stated: "Consistent with the Court's ruling, this instruction will be refused." To ascertain the meaning of that statement it is necessary to

revert to a colloquy that occurred in chambers out of the presence of the jury while the defendant Kester Collins was testifying as a witness, the colloquy having resulted from the objection of the prosecutor to a question asked on direct examination. The court's comment appears on page 177 of the record and is as follows:

> Court: I am going to put my comments into the record. I feel that in this case, as I find the law in this State, whether it is correct or whether it isn't correct, I find that the law of self defense arises on the part of a defendant where an assault is made upon himself, a member of his immediate family or where the agency of master and servant arises.
>
> I cannot find, and I have looked hard, that the right of self defense arises to go to the aid of a third party.
>
> As to a proprietary interest, which this Court has mentioned before in the progress of this case, as being extremely interested in it, I find that a proprietary interest arises to prevent, such as in murder, to prevent this from happening to the class of people that I have mentioned here before, the prevention of arson against one's own property, the prevention of robbery of one's own property or rape of a member of one's immediate family, *and though this law should be general, with the modern viewpoint of the law, it seems not to have been covered by the law in this State up to this time.* (Emphasis added.)

At this point, although it may be somewhat out of order, I think it pertinent to cite the decision of this Court in *State v. Greer*, 22 W.Va. 800 (1883). This is the fifteenth syllabus point of that case:

> The right of self-defence may be exercised in behalf of a brother or a stranger.

Furthermore, this sentence appears in the body of the opinion: "The right of self-defence [sic] may be exercised in behalf of a brother, or of a stranger." It may be true that there are statements contained in the opinions of other cases, and, of course, it is good law that a person may go to the defense of a member of his immediate family and that such is true where

the relationship of master and servant exists, but in none is there a statement to the effect that the same rule is not applicable where the intervention is by a "stranger." It is interesting also indeed to note that the *Greer* case is not cited or discussed in the brief of the Attorney General or the opinion of the majority. Neither is one case cited by either the Attorney General or the majority that is in conflict with the *Greer* case. I believe there is a good reason why no such authority is cited: there is none.

The reason given by the majority for sustaining the action of the trial court in refusing to give Defendant's Instruction No. 8 is as follows: "This instruction, like Instruction Number 7, is not sustained by the evidence and tends to mislead the jury and for that reason it was properly refused." Inasmuch as the majority did not see fit in their opinion to quote Instruction No. 8, I believe it advisable at this point to do so verbatim:

### DEFENDANT'S INSTRUCTION NO. 8

The Court instructs the jury that a person who sees a serious crime in process of being committed or carried out against some other person upon his premises need not stand idly by, but is entitled under the law to take all steps reasonably necessary to prevent those engaged in the commission of such crime from carrying their criminal activity any further; and, accordingly, if you find from the evidence in this case that while in the beer tavern owned and operated by the defendant at the time in question Robert Evans and Riley Evans made an unprovoked assault upon the body of John L. Marcum, Jr., and, in the presence of the defendant at the time and place were so engaged in carrying out that assault as to cause a reasonable person to believe that serious bodily harm was being inflicted upon John L. Marcum, Jr., or that the nature of the assault was such as to put him in danger of losing his life, then Kester Collins had the right to interfere, and to take all steps reasonably necessary to bring the assault to a halt, and that the defendant had the right to arm himself for that purpose, but the defendant acted at his peril, and it is for you ladies and gentlemen of the jury to decide whether the defendant's conduct under the

circumstances then prevailing, as in the evidence in this case, was reasonable and necessary.

> Refused,
> CWF, III

With reference to the question of whether a proper showing had been made by the defendant for the introduction of evidence to the effect that the deceased and his brother Riley Evans had the reputation in the community in which they had lived most of their lives for being men of dangerous and violent character, this statement is made in the Attorney General's brief:

> Upon reviewing all the evidence pertaining to the shooting incident in the instant case and applying the various principles of law of self-defense, it is clear that the proof offered wholly failed to establish, or tend to establish, the defense of self-defense in favor of the defendant. Accordingly, the defendant was not entitled to introduce evidence as to the reputation of the deceased shooting victims as men of dangerous and violent character.

This is the holding of the Court upon that issue as stated in the majority opinion:

> * * * As already indicated, there was no *appreciable* evidence to support the defense of self-defense and no evidence showing or tending to show that either Robert Evans or Riley Evans was at the time of the killing making a *murderous attack* upon the defendant. Because of the absence of such evidence the defendant was not entitled to show that either Robert Evans or Riley Evans was a man of dangerous and violent character and reputation. The action of the court in refusing to admit evidence of that nature did not constitute error. (Emphasis added.)

"Murderous attack" is not the test for the exercise of the right of self-defense. Fortunately, the majority corrected its error, for this is the first syllabus point of the majority opinion:

> When in a prosecution for murder the defendant relies upon self-defense to excuse the homicide and the evidence does not show or tend to show that the

defendant was acting in self-defense when he shot and killed the deceased, the defendant will not be permitted to prove that the deceased was of dangerous, violent and quarrelsome character or reputation.

If there is any rule of law in this State that is so firmly established that it is irrevocable, it is that the State cannot prosecute a writ of error to this Court or cross-assign error from an adverse ruling in favor of a criminal defendant by a trial court. The only exception to that rule is contained in Code, 58-5-30, as amended, in this language:

[W]henever in any criminal case an indictment is held bad or insufficient by the judgment or order of a circuit court, the State, on the application of the attorney general or the prosecuting attorney, may obtain a writ of error to secure review of such judgment or order by the supreme court of appeals. * * *

There can be no doubt that when a defendant is found guilty of any crime or is found not guilty either by the jury of its own accord or at the direction of the court, the State has no recourse by way of appellate procedure.

It is evident that the Attorney General and the majority overlooked the fact that the trial judge in this case ruled upon the question of whether a sufficient showing had been made by the defendant to permit the introduction of evidence as to the bad character of the deceased and his brother. Lest there be misunderstanding in this regard let me quote the exact language used in making that ruling:

However, I think that the law is this, as far as self defense and what the defendant has testified to up to this point, that if there is any act, regardless of how slight, that this Court can view as an overt act toward the defendant himself, that the right of self defense should be allowed to go before the jury and to deny this defendant that right would deny him in essence any defense at all.

Therefore, it will be the ruling of the Court that the evidence which has come into this case, as to the motion of the deceased, what they did at that particular time, is admissible and the objection to its admission is overruled.

*Further, the objection as to the character of the deceased will be overruled and this character may come in as a part of what I have ruled as far as self defense because to rule otherwise would be, in effect, directing a verdict in this case and this Court cannot do that.* (Emphasis added.)

The rule as to the admissibility of reputation evidence is laid down in WIGMORE ON EVIDENCE, Section 246, and, until the decision of this case, I thought the law in that regard was so firmly settled in this jurisdiction that it was no longer open to question. This is what Wigmore says:

Two peculiar questions may arise under the overt-act form of the doctrine. (1) *Shall the question whether an overt act is sufficiently evidenced to lay the foundation for the reputation-evidence be left entirely in the hands of the trial Court? Unless our law is to become a mass of quibbles which no practitioner can master and every murderer will welcome, the answer must be in the affirmative.* (Emphasis partially added.)

It is clear from the quotation of the trial judge dictated into the record and above quoted that he did find there was evidence of self-defense sufficient that "this character may come in as part of what I have ruled as self defense." The only cases ever decided by this Court in which such preliminary ruling by a trial court was considered was when such ruling was adverse to the defendant, and upon writ of error this Court had the right to and did determine whether the trial court had abused its discretion in refusing to permit character evidence to be admitted as to the reputation of the deceased at and prior to his death.

I want to reiterate that it is my opinion that this Court cannot overrule the finding of the trial court to the effect that such evidence is admissible upon writ of error or cross-assignment of error by the State inasmuch as the State, as heretofore stated, can seek a writ of error in this Court only from an adverse ruling wherein the trial court has held an indictment to be invalid. Also, to repeat, once the trial court had made the ruling as to the admissibility of character evidence it was reversible error for him not to permit the

defendant and his witnesses to testify that the deceased brothers bore the reputation of being men of violent and dangerous character. It was not sufficient to permit the witnesses to testify that their reputation for being "peaceable and law abiding" citizens was bad. This Court has not "reversed" or criticized the ruling of a trial court to the effect that it was sufficient for the admission of such evidence in a murder case if the defendant pleaded not guilty but admitted the killing and relied upon self-defense as justification for his act "inasmuch as a material element thereof was the kind of man with whom he was dealing." That would appear to have been the case in *State v. McCausland,* 82 W.Va. 525, 96 S.E. 938 (1918). This is the ninth syllabus point of that case:

> Where one charged with murder admits the killing and attempts to justify his act upon the ground of self defense, it is proper for him to prove that the deceased was a violent and dangerous man, not only at or about the time of the killing, but that he had been such continuously for many years prior thereto.

Incidentally, in that case, there was no serious objection by the State to the introduction of such evidence with regard to the deceased at or about the time of the killing, but the State did object to proving the character of the deceased at a time remote from the killing. The Court in the opinion with regard to that matter said:

> \* \* \* *Evidence of the character of the deceased in this regard [for being a violent and dangerous man] at or about the time of the killing is, of course, pertinent, and was admitted by the court below,* but how much stronger would this evidence be if it could be shown that this quarrelsome or violent disposition was not one which was only attributable to him for a short time, but that he possessed such traits of character for many, many years. The jury would get a very much better view of his real disposition in this regard if they were allowed to hear evidence of his character in this regard covering as much of his past life as was readily available. (Emphasis added.)

This Court has held that such evidence is particularly pertinent and admissible upon a plea of self-defense where the

defendant himself was acquainted with the reputation of the deceased as a man of violent and dangerous character. Kester Collins, if permitted to do so, would have testified that he had known Robert Evans and Riley Evans all of their lives and knew their reputations to be bad in that regard. This insofar as pertinent is quoted from the second point of the syllabus of *State v. Porter*, 98 W.Va. 390, 127 S.E. 386 (1925):

> In general, the mode of proving the violent and dangerous character of the deceased is by showing that such was the general reputation of the deceased in that community and at that time and that such reputation was known to the defendant. . . .

This is the third syllabus point of *State v. Walker*, 92 W.Va. 499, 115 S.E. 443 (1922):

> Where the reputation of a policeman as a dangerous and quarrelsome man is in issue, evidence thereof should not be confined to the locality in which he lives; evidence of those who know such reputation where he discharges his duty may be received.

To the same effect is the rule laid down in *State v. Hardin*, 91 W.Va. 149, 112 S.E. 401 (1922), and other decisions of this Court. After making the ruling heretofore quoted, the trial court refused to permit the defendant to prove that the deceased and his brother had the reputation of being men of dangerous and violent character, but for some unaccountable reason ruled that the defense in framing its questions would be required to use "peaceable and law abiding citizens" rather than to use the words "dangerous and violent." It is my opinion that that was prejudicial error, and, if for no other reason, the conviction of this defendant should be reversed and he should be granted a new trial.

It is evident that the trial court erroneously applied the rule that is applicable where the character of the deceased is at issue and the State is attempting to prove that his reputation was good. "Dangerous and violent" is the language that has been approved by this Court, and in that regard this statement is contained in the *Walker* case:

*  *  *  *Witnesses both for the state and the accused
were permitted to testify to the general reputation of
deceased as a peaceable and law abiding man, and
as a dangerous and quarrelsome man,* in the city of
Charleston generally and in the various places where
he had lived before he came to the city, *and the repu-
tation of the deceased in that regard was thoroughly
placed before the jury as contended for by prosecu-
tion and defense.* (Emphasis added.)

This jury was told that the reputation of the Evans brothers
as peaceable and law abiding citizens was bad which was not
synonymous with being told that they had reputations as
"dangerous and violent" men. Clearly, one can have a bad
reputation for being peaceable and law abiding and not be
dangerous and violent. The difference is patent. Take the
example of a shoplifter. He is not peaceable and law abiding,
but clearly it cannot be said that his shoplifting categorizes
him as a dangerous and violent man.

Now to revert to Instruction No. 8. This, of course, was not
a self-defense instruction and not intended to be. The purpose
of that instruction was to prevent the defendant from being
branded as an aggressor. Instruction No. 7 was of similar
import, except that the premise of it was that as a proprietor
of the combination grocery and beer establishment, the de-
fendant was under a duty to protect a patron who was with-
out fault and upon whom it is conceded in the majority
opinion a violent and felonious attack was being made. Even
from the State's evidence it is clearly shown that he had
received serious bodily injury before the defendant inter-
vened. The patron, Junior Marcum, was being beaten and
choked by Robert Evans, while Riley Evans was methodically
breaking bottles over his head. One state witness said that
blood was flowing down Marcum's head onto his shirt and
that he was unconscious. The trial court gave Defendant's
Instruction No. 4 which informed the jury that the defendant
had a right to testify in his own behalf and that the jurors
had no right to disbelieve his evidence simply because he was
the defendant and that they should weigh and consider his
testimony the same as that of any other witness in the case
which, of course, is the law of this jurisdiction. The defendant

testified that after the unprovoked assault began upon Marcum by the Evans brothers that he attempted to stop it at a time when he was unarmed and that Riley Evans turned on him with a bottle in his hand and Robert Evans kicked him against a juke box. This testimony was corroborated by two other witnesses.

Accompanying the Evans brothers to the defendant's place of business on that night was one Tiny Spaulding, the first name being a nickname, and, apparently, his real name does not appear in the record. The record does show that he received the nickname because of his enormous physical stature. After the fight started, Marcum was on the floor being beaten and choked by Robert Evans, and Riley Evans was breaking bottles over his head. One James Spry advanced toward the fight apparently with the intent of trying to stop it when Tiny Spaulding, a friend of the Evans brothers, stepped in front of him and told him in substance "to keep out of it," which he did.

It is stated in the majority opinion that neither of the Evans brothers "at any time made any threats against the defendant or committed any overt act which justified any belief that either of them was about to commit or intended to commit any attack upon the defendant which would endanger his life or inflict grave bodily injury upon him." It is uncontradicted that when Robert Evans saw Junior Marcum approaching the entrance of the building that he told the defendant he was going "to whip that so and so and you had better keep out of it." Although there is some conflict in the evidence, the defendant testified that after he had fired the second warning shot, Riley Evans "raised up" with a bottle in his hand and turned toward defendant and, as stated in the majority opinion, reached for his pocket. Robert Evans, according to the testimony of the defendant, at about that time, turned in the direction of the defendant and also reached toward his pocket. One Florence Vance, a witness who testified in behalf of the State was asked these questions and made these answers:

Q. Were they fighting with Junior at that time or not? Do you know?

A. Before he shot them?

Q. Yes.

A. They were fighting.

Q. At the time he shot them, were they doing anything?

A. They were fighting.

Incidentally, that evidence would seem to be somewhat in conflict with that of the defendant. Another State's witness was asked what the Evans brothers did after the first warning shot was fired and stated that Robert continued fighting with Junior Marcum on the floor and that Riley continued to break bottles over his head.

This statement is contained in 40 AM. JUR. 2d, § 170, with cases cited in the footnotes to support it:

> * * * A father has the right to protect his daughter from the personal violence of her husband, and to go to his premises for that purpose; and while it has been held that no such duty obtains in the case of a man and a woman whom he maintains as his mistress, it is not to be understood that the right to kill in defense of another is limited to cases of relationship; on the contrary, human life may be taken for the protection of a companion, or one whom a person is charged with protecting, a master or servant, or any other person, *even a stranger*, although doubtless a clearer, more pressing need of protection should be apparent in these latter cases. (Emphasis added.)

This statement is contained in 26 AM. JUR., § 160:

> * * * [A] homicide in the supposed or alleged defense of another is justifiable or excusable when committed by one who has reasonable cause or grounds to believe, and in good faith does believe, that the person in whose behalf he acts is in imminent danger of death or serious bodily injury at the hands of an assailant. In any case the defendant

must have acted upon an honest conviction of necessity. If it is made to appear that the deceased intended to kill, the presumption is that the accused had a right to slay him.

Cases supporting this statement are contained in the footnotes. See also 10 A.L.R.3d, beginning at page 619, under this Annotation: "Private Person's Duty and Liability For Failure To Protect Another Against Criminal Attack By Third Person."

In *Moone v. Smith,* 6 Ga. App. 649, 65 S.E. 712 (1909), it was held that when a person keeps a place of amusement and invites the public to come therein for the purpose of his business, he must be taken to promise protection against such injuries or risks as the character of the business he is conducting would naturally suggest to him might be expected where due care is not taken to guard against their occurrence, and to insure to the person entering a safe egress. In *Stanley v. Commonwealth,* 86 Ky. 440, 6 S.W. 155 (1887), this is the sole headnote:

> A person committing homicide is *excusable,* if he does it under the *bona fide* belief that it is necessary to protect the life either of himself or another, and an instruction confining the excusability to *actual* necessity, and excluding *reasonable appearances,* is error.

These statements are contained in the opinion of that case:

> "The doctrine here is that whatever one may do for himself he may do for another; * * * and, on the whole, though distinctions have been taken and doubts expressed, the better view plainly is that one may do for another whatever the other may do for himself." 1 Bish. Crim. Law, §877. Another writer uses this language: "A well-grounded belief that felony is about to be committed will extenuate homicide committed in prevention, but not in pursuit, by a volunteer. * * * A *bona fide* belief that a felony is in process of commission, which can only be arrested by the death of the supposed felon, makes the killing excusable; but the belief must be honestly entertained, and without negligence, and, if non-negligent, it will excuse the homicide. * * * A person has a right

to repel a felony threatened to be perpetrated either on himself or others. * * * The intentional infliction of death is justifiable when it is inflicted by any person in order to defend himself or any other person from immediate and obvious danger of instant death or grievous bodily harm, if he, in good faith, and on reasonable grounds, believes it to be necessary when he inflicts it. * * * Self-defense will justify a person in defending those with whom he is associated, and in killing, if he believes life is in danger; and the right may be exercised by the servants and friends of the party assaulted, or any one present, in repelling an attempted felony." Desty, Crim. Law, § § 125*d*, 126, 126*a*. The courts were slow to adopt this doctrine in its full extent, doubtless, for fear that it might be abused, and sometimes serve as a shelter to those who, under the plea of protecting the lives of others, merely executed their own guilty purposes.

The Court then stated that the rule is not open to this objection when properly applied.

The right of self-defense rests upon necessity; and apparent reasonable necessity is the whole law and reason of it. It was not derived from society. It is a natural right, instinctive in the person. Man, when he comes into society, brought it with him in all its freedom and proudest sense. It has been restricted by law in its exercise to cases of necessity, but cannot be denied. If it were possible, it should not be, because as now restricted it serves to protect right against wrong in emergencies where the law would not avail. It is the duty of a man who sees a felony attempted by violence to prevent it if possible. This is an active duty, and hence he has a legal right to use the means necessary to make the resistance effectual.

\* \* \*

So great, however, is the law's regard for human life, that he must be careful and not violate the restriction that law and society have placed upon this right of self-defense, to-wit, he must act from necessity, or reasonable apparent necessity, and not be in fault. Not only, however, may he do this, but another may do it for him. This other person in such a case steps into the place of the assailed, and there attaches to him, not only the rights, but also the responsibilities,

of the one whose cause he espouses. If the life of such person be in immediate danger, and its protection requires life for life, or if such danger and necessity be reasonably apparent, then the volunteer may defend against it, even to the extent of taking life, provided the party in whose defense he acts was not in fault. He interferes at his peril if the person slain was not in fault.

\* \* \*

The innocent cannot be sacrificed to save the guilty. This would be paradoxical. A volunteer must not kill in behalf of one in fault. This would be what some writers have termed a negligent killing. He may, however, do so for one not in fault, if the impending danger thus brought about be either actual or apparent.

\* \* \*

In such a case the doctrine of self-defense in all its principles extends to the accused, just as it would if the felony had been attempted upon him, or as it would apply to the one in danger if he had done the killing.

This is the third headnote of *Biggs v. Commonwealth,* 164 Ky. 223, 175 S.W. 379 (1915):

What one may lawfully do in his own defense another may do for him; a belief in good faith, based upon reasonable grounds that a felony is about to be committed which can only be prevented by the killing of the would-be perpetrator, excusing the killing.

The court in the opinion said: "The only defense which appellant offered was that of self-defense . . . ." The court then held that the fourth instruction given by the trial court, by which it was attempted to present that defense for consideration by the jury, was reversible error in that it limited the right of the accused to defend himself or another "by reason of his, in good faith, belief" that he or the other person was at the time in impending danger of death or great bodily harm at the hands of the deceased "to the belief upon the part of the jury that the deceased was then about to inflict death or great bodily harm" upon him or another. In other words, the court held that the jury should have been instructed that the accused

might act upon what was reasonably apparent to him from the circumstances surrounding him to be his peril or that of the one whom he was defending. The court held that while the accused must, before he can take the life of one who is about to kill or seriously injure another, have "such grounds for his belief as, by the exercise of a reasonable judgment, would cause such a belief to arise." The court further held that the right to so act "arises from his belief for the necessity of it, and not from the belief of the jury as to the necessity for it." The rule which seems to be universal (with the possible exception of West Virginia in view of the decision of the Court in this case) was stated thusly:

> Whatever one may lawfully do in his own defense, another may do for him. A belief in good faith, based upon reasonable grounds for such belief, that a felony is in process of commission, and which can only be prevented by the killing of the would-be perpetrator of the felony, will excuse the killing. Wharton's Criminal Law, §533; Bishop's Criminal Law, §877 . . . .

Near the end of the majority opinion forty-eight cases are cited under these rules: "An instruction which does not correctly state the law is erroneous and should be refused. * * * It is reversible error to give an instruction which tends to mislead and confuse the jury. * * * Instructions must be based upon the evidence and an instruction which is not sustained by evidence should not be given." I have no complaint whatever with those principles of law nor with a single case that is cited in support of them. Incidentally, the only criminal case cited is *State v. Morrison*, 49 W.Va. 210, 38 S.E. 481 (1901). The facts in that case show that the defendant, the deceased and one Dempsey, were living in a shanty while engaged in timbering. On the morning they were leaving they secured some whiskey and began drinking before breakfast. An argument ensued over an inconsequential matter between the defendant and William Rule, the deceased, whereupon Morrison struck Rule "with a heavy stick which they had used in attending their fire," which blow resulted in his death. The jury found the defendant guilty of murder in the second degree. One of the assignments of error was the refusal of the trial court to give Defendant's Instruction No. 4 which read:

> The court further instructs the jury that in determining the question of defendant's guilt or innocence in this case, it is the duty of the jury to weigh and consider all the evidence that has been introduced, establishing or tending to establish the good character of the defendant, as well as all the evidence tending to establish the quarrelsome, overbearing character and disposition of the deceased.

The trial court instead gave this instruction:

> The court further instructs the jury that the law presumes the prisoner innocent, and that in determining the question of the defendant's guilt or innocence in this case it is the duty of the jury to consider and weigh all the evidence that has been introduced including that tending to establish the good character of the defendant.

This Court gave as its reason for refusing to hold the giving of the instruction as offered erroneous and giving instead the substitute that the instruction as offered gave undue prominence to isolated portions of the evidence and ignored the most vital evidence of every theory of the case. The Court said:

> \* \* \* It also seeks to apply the evidence of the bad character of the deceased to the general issue in the case, the guilt or innocence of the prisoner. That is improper. It has no such application; *it is only applicable to, and can only be used in connection with, the issue of self-defense. Upon no other ground is such evidence admissible in a case of homicide.* (Emphasis added.)

It is my opinion that this Court should have of its own motion, although not formally assigned as error, found that State's Instructions Nos. 3, 5 and 7 were objectionable and improper and that when given over the objection of counsel for the defendant were reversible error. In *State v. Sauls*, 97 W.Va. 184, 124 S.E. 670 (1924), the theory propounded by these instructions that murder automatically comes into being upon the killing of one person by another by firing a deadly weapon was totally and completely rejected. This is the eighth point of the syllabus in the *Sauls* case:

An instruction that the jury may infer malice, the intent to kill, and the willfulness from the unlawful use of a deadly weapon previously obtained, and which omits mention of any of the circumstances of the case which might, in the minds of the jurors, rebut such inferences, is erroneous.

This is the pertinent part of syllabus point seven of that case:

[A]n instruction in the trial of one for murder, which charges the jury that a homicide is presumed to be murder in the second degree, without referring to the particular circumstances of the instant case is abstract and too comprehensive.

In *State v. Best,* 91 W.Va. 559, 113 S.E. 919 (1922), this Court held that an instruction to the effect that "malice might be inferred, without reference to the facts and circumstances calculated to rebut such inference of malice," is misleading.

In *State v. Whitt,* 96 W.Va. 268, 122 S.E. 742 (1924), this is the third syllabus point, insofar as is material:

Where the facts and circumstances of a homicide case are such that they may in the minds of the jurors rebut a mere inference of malice on the part of the accused, an abstract instruction to the effect that . . . deliberation, wilfulness and malice may be inferred from the use of a deadly weapon; and which omits to mention any of the various circumstances tending to rebut such inference, is erroneous.

Incidentally, that instruction was taken from *State v. Welch,* 36 W.Va. 690, 15 S.E. 419 (1892), and had been severely criticized by Judge Brannon in that case but not held to be reversible error. In the opinion in the *Whitt* case the Court very appropriately said:

\* \* \* An instruction should have reference to the facts shown in the case on trial. For this reason it is as a general rule bad practice to lift bodily from another case an instruction probably applicable to the facts shown there and use it in a case where the facts shown are totally different.

Although, as heretofore stated, Instruction No. 8 is clear and unambiguous, could not possibly mislead the jury and was

supported by overwhelming evidence, it is my opinion that, even assuming that to be incorrect, the Court has, by not finding Instructions Nos. 3, 5 and 7 prejudicial, considered and determined "the law as to the right of a person to intervene to protect another person whose life is in danger and as to the degree of force he may use to repel the attack of the assailant," that being a quotation from the majority opinion.

Defendant's Instruction No. 8 did not tell the jury that the defendant even under the circumstances then prevailing had a right to secure a pistol, return to the barroom and kill the Evans brothers. In fact, it is couched in the most cautious language and merely informs the jury if they find from the evidence that such an assault was being made upon Junior Marcum by the Evans brothers as to cause a reasonable person to believe that serious bodily harm was being inflicted upon him or that the nature of the assault was such as to put him in danger of losing his life that the defendant had the right to intervene, take all steps reasonably necessary to bring the assault to a halt, even the right to arm himself for that purpose if that were necessary, "but the defendant acted at his peril," and it was for the jury to decide whether, under the circumstances then prevailing, it was necessary for him to intervene and arm himself to stop the assault. Of course, it may have been a jury question as to whether the defendant went too far after stopping the fight. The jury could still have found the defendant guilty of some offense, but when the trial court failed to give this instruction the door was open for the prosecutor to brand him an aggressor and in fact most of the State's instructions are based upon the theory that he was an aggressor.

It is evident from a review of the decisions of other jurisdictions and all of the authorities upon the subject that this instruction is in conformity with the law of the land, that is, every state in the Union, including West Virginia, unless *Greer* is to be overruled, disapproved, or distinguished because in that case the defendant intervened to protect his brother against an alleged assault of the deceased. As heretofore stated neither the Attorney General in his brief nor the majority in their opinion attempted to distinguish the *Greer*

case upon that ground or any other. Actually the evidence in this case with regard to the necessity for the defendant to intervene to save the life of Junior Marcum is much stronger than was the evidence in the *Greer* case. Although decided eighty-nine years ago, to this day it has not been overruled or criticized by any decision of this Court including the present decision. Furthermore, it is evident that this Court has never made a distinction between the right to go to the defense of a relative as distinguished from some other person although evidently the trial court as heretofore noted was mistakenly of that belief. It is also clear from the citations of authority in this opinion that the general rule is that a person may intervene if the circumstances warrant it to protect from serious bodily injury or death "even a stranger" if the one attacked is without fault. Briefly, these are the facts in the *Greer* case: On the 19th day of January, 1882, John M. Greer was drunk on a street in Ripley, the county seat of Jackson County, and although some distance from the deceased, called the latter "a damned cowardly scoundrel and a thief." The deceased removed his coat and advanced toward John Greer, although there was a conflict in the evidence as to whether he had a knife in his hand, but when he came near to John Greer, James Greer, the defendant (who was sober) said to the deceased, "Bobby stop; we are sober and John is drunk," and deceased replied, "That is all right, but I don't intend to take his slang." The evidence shows that immediately thereafter the deceased attempted to pass around the defendant toward John Greer when the defendant struck him in the neck with a pocket knife, inflicting a wound from which he died shortly thereafter. Even under those circumstances, the court gave to the jury Instruction No. 13 which is in the following language:

> If the jury believe from the evidence that the prisoner and John M. Greer, his brother, on the day of the homicide were together on the sidewalk of a public street in the town of Ripley, in this county, and that immediately before the affray in which the fatal wound was given the said John M. Greer, at a distance of abount [sic] 95 feet from the deceased, and that the deceased was sitting on the door-step of his father's store on the same street, applied abusive language to the said deceased, and that thereupon

the deceased rose to his feet, threw off his coat and rapidly advanced upon the said John M. Greer, who was behind the prisoner a short distance; and if the jury further believe from all the evidence in the case that the deceased assaulted the said John M. Greer, in such a manner, or under such circumstances as to furnish reasonable grounds for apprehending a design to do him great bodily harm, and there was reasonable grounds for believing the danger imminent that such design would be accomplished, and the prisoner had reasonable grounds to believe and did believe such danger was imminent, he was justified in acting upon such appearances, and in killing the deceased without retreating, if he had reasonable grounds to believe and did believe that such killing was necessary to avoid the apparent danger, the killing under such circumstances is excusable, although it may afterwards have turned out that the appearances were false, and there was in fact no design to do the prisoner or his brother great bodily injury, nor danger that it would be done; and as to the imminence of the danger which threatened the prisoner or his brother, and the necessity of the killing in the first instance, *the prisoner was the judge, but he acted at his peril, as the jury must pass upon his actions in the premises, viewing his actions from the prisoner's standpoint at the time of the killing;* and if the jury believe from all the facts and circumstances in the case that the prisoner had reasonable grounds to believe and did believe the danger imminent, and that the killing *was necessary to protect* himself or his brother from great bodily harm, he is excusable for using the pocket-knife in his possession —his own defense or in the defense of his brother. (Emphasis added.)

That instruction and Defendant's Instruction No. 8, which was refused by the trial court and which this Court refused to find was reversible error, are indistinguishable as to the law applicable to the situations faced by the defendant in the *Greer* case and the defendant in the instant case. The facts in the instant case will not be repeated inasmuch as they have been stated at some length both in the majority opinion and this opinion except to note from Tiny Spaulding's testimony, a witness of the State, that before he and the Evans brothers left Columbus, Ohio, they purchased two eight-packs

of beer which they drank on their way to Huntington, and the evidence shows that Robert at least was drinking at the defendant's place. The evidence is uncontroverted that Junior Marcum was sober and in no way provoked the altercation. He was, to use a word that is contained in the *Greer* opinion, "faultless." Kester Collins, the defendant, had a responsibility to intervene beyond that of the ordinary spectator and, as the cases heretofore cited show, might have been civilly liable to Junior Marcum had he not done what was necessary to protect his patron from death or great bodily harm. Furthermore, he was the operator of a combination grocery-beer establishment and had a license from the Beer Commissioner as a beer retailer. Code, 11-16-13, as amended, provides that such a licensee has a responsibility to prevent any act from being done upon the licensed premises which constitutes a crime under the laws of this State, the violation of which would subject the defendant to possible revocation of his license. The aggressors were the Evans brothers, and the record reveals no motive for the vicious assault which they made upon Marcum unless an inference may be drawn from the fact that he was a former deputy sheriff of Mingo County and the Evans brothers had a reputation as being men of violent and dangerous character.

To repeat what has heretofore been said, it is evident from the evidence of one or more of the witnesses for the State, as well as the witnesses for the defense, that Junior Marcum had not only been seriously injured but that a reasonable man could infer that if the assault continued he would be killed. It was only under those circumstances and after he had tried unsuccessfully to stop the assault without a weapon that the defendant secured a pistol and fired two warning shots, and when the brothers "turned" on him, one with a bottle in his hand and each reaching for his pocket, fired five more shots in rapid succession which resulted in their deaths. It is difficult to understand how under those circumstances Defendant's Instruction No. 8 should not have been given, and it is my opinion that it was reversible error to fail to do so.

I would reverse the judgment of the Circuit Court of Mingo County and remand the case to that court for a new trial.